Finding no error in the record, the order and judgment of the court below are affirmed.

LEE, McFIE, and FREEMAN, JJ., concur.

---

[No. 516.   August 24, 1892.]

EDWARD G. BERRY ET AL., APPELLEES, V.
HENRY HULL ET AL., APPELLANTS.

ELECTION CONTEST—COUNTY SEAT, ELECTION TO LOCATE—PLEADING—
EVIDENCE.—In a proceeding, by bill in equity, to contest an election to locate a county seat for San Juan county, which, it was admitted, sufficiently alleged the casting of illegal votes, by minors, nonresidents, aliens, and persons procured to vote by bribery, naming persons who had voted illegally, and charging that numerous other persons unknown to the complainants, had voted at said election "illegally and fraudulently,"—it was not error to admit evidence of illegal voting by persons other than those named in the bill.

ID.—AMENDMENTS—PLEADING.—In such proceeding, an amendment to the bill, to conform to the proof, naming such other persons, who, it was charged, had voted illegally, was properly allowed after the testimony was closed, under section 1911, Compiled Laws, providing that each party shall have leave to amend "at any time before verdict, judgment, or decree," upon such terms as the court may think proper.

ID.—DECLARATIONS OF VOTER—EVIDENCE.—Evidence of the declarations of one, who voted at such election, as to his qualifications as to residence and the town he voted for, was, by itself, inadmissible, as was also an affidavit made by him sometime afterward as to the fact of his citizenship by naturalization, in the absence of any evidence that any effort had been made to take his deposition.

ID.—CERTIFICATE OF PRIEST—EVIDENCE.—The certificate of a priest, who had baptized a person, as to the age of such person, is inadmissible.

ID.—PLEADINGS—EVIDENCE.—In an election contest, to locate a county seat, where the bill alleges that a certain person voted for a certain town, and such allegation is not denied by the answer, it will be taken as admitted.

ID.—QUALIFICATION OF VOTERS—NATURALIZATION—CERTIFICATE OF CITIZENSHIP.—Under section 1141, Compiled Laws (Organic Act, sec. 6), providing that the right of suffrage shall be exercised only by citizens of the United States, and sections 2004, 2165, Revised Statutes, United States, providing that all citizens of the United States otherwise qualified by law to vote at any election, etc., shall be entitled to vote, and that foreigners of twenty-one years of age, with certain exceptions, must make a preliminary statement of their intention to become citizens at least two years before legally made such, — a person of foreign birth, not within the exceptions named in the statute, who did not take out his citizenship papers until after he had voted, and whose father was not naturalized until after he had attained his majority, was not a qualified voter.

ID.—CITIZENSHIP—PROOF.—The certificate of intention to become a citizen of the United States is the only competent proof of that fact.

ID.—QUALIFICATION OF VOTERS—SECTION 2166, REVISED STATUTES, UNITED STATES, CONSTRUED.—An alien who had served in the marine service of the United States, and had been honorably discharged, but who had not been naturalized, was not a legal voter, under section 2166, Revised Statutes of the United States, providing that any alien over twenty-one years of age, who has enlisted in the armies of the United States, and been honorably discharged, may become a citizen after one year's residence without any previous declaration of his intention to do so, the statute only intending to exempt such persons from making the declaration of intention.

ID.—PARTIES TO RECORD—EVIDENCE.—In a proceeding to contest an election, locating a county seat, all persons voting at such election are parties to the proceeding, though not made parties, for the purpose of admitting evidence of their declarations as to their qualifications and motives in voting for a particular town, when the fact that they voted for such town has first been established by evidence aliunde.

ID.—BRIBERY—EVIDENCE.—Where, in such proceeding, it appeared from the evidence that a company organized in the interest of Junction City, one of three towns competing for the location of the county seat, previously and up to the day of election, and not afterward, issued to voters of the county certificates of sale of valuable lots, for which there was no consideration, and upon the presentation of which deeds were to be made on the payment of $1 per lot, but not until after the election, by a limited time after which none would be made; and there was evidence that these payments were not to be made for the lots, but for making the papers; also that the subject of voting for Junction City was mentioned whenever a certificate was issued,—Held:  The issue of such certificates of sale of lots to voters, and deeds to be made to them, was an "inducement," within the meaning of section 4, chapter 135, Laws, 1889, to vote for Junction City, and constituted bribery, although the voters receiving them testified they were not given for that purpose, and that they were not influenced thereby, upon the showing that the offer was illegal, and of the acceptance, the jury might well presume, in the absence of contradictory evidence, that the taking was illegal.

ID.—BARGAIN FOR VOTES.—Where it further appeared, in such proceeding, that before the election a committee from a voluntary association of citizens of the town of Largo, organized in its interests, with the intention at first of entering the contest for the location of the county seat, met a committee from an association of the town of Aztec; and it was agreed between them that the latter association should give to the former one half of its town lots and a certain portion of a forty acre lot, and pay them for a certain piece of land they had purchased in Largo for county purposes, in consideration that Largo would withdraw from the contest, and that the Largo people would work for Aztec,—Held:  The Largo association was not a legal organization, the acts of whose representatives could bind any one but themselves, unless there was proof positive that the voter presumed to have been represented was shown to have directly authorized someone to act for him, and votes in favor of Aztec by residents of Largo, not parties to the agreement, were not illegal, in the absence of such proof, or that they received any benefit from the agreement.  But those votes cast for Aztec, by residents of Largo, who were parties to such agreement, were illegal.

ID.—QUALIFICATIONS OF VOTERS.—RESIDENCE.—A person formerly resid-
ing in this territory does not forfeit his right to vote by absence from
the territory for the time specified in section 1214, Compiled Laws,
providing that a citizen to be entitled to vote must be a resident of
the territory, county, and precinct for a certain time "immediately
preceding the election," unless it be shown it was his intention to
change his residence: the mere fact of his being out of the territory
with a camping outfit was not sufficient to show such intention.

ID.—QUALIFICATION OF VOTERS—CHANGE OF RESIDENCE.—A married man
who moves his family outside of the territory, and there rents and
cultivates a farm, shows, by such act, his intention to change his
residence, and is not a qualified voter.

APPEAL, from a decree in favor of complainants,
from the First Judicial District Court, San Juan
County. Decree affirmed.

The facts are stated in the opinion of the lower
court, herein set out; and referred to in the opinion of
the supreme court as "in the main correct," in its
findings of fact, and the application of the law thereto.

N. B. LAUGHLIN for appellants.

The attention of the court is called to the rulings
of the court below in permitting complainants to with-
draw their replication and file their fourth amendment,
after they had taken their testimony and closed their
case; also to the rulings of the court in overruling the
motion of the defendants to strike out the fifth amend-
ment to the bill, without requiring them to withdraw
their replication, and giving respondents leave to
answer it, and take additional testimony, and, after
arguments were closed and the cause closed and sub-
mitted, amendments not allowed after publication. 1
Danl. Ch. Pl. & Pr., sec. 416; Story, Eq. Pl., secs. 87,
265, and note; Thorn v. Germand, 4 Johns. Ch. 363;
Mitford's Pl. 257, 258, 259; Shephard v. Merril, 3
Johns. Ch. 425; Verplank v. Mercantile Ins. Co., 1
Edw. Ch. 46; Rogers v. Rogers, 1 Paige, Ch. 424;

Whitman v. Campbell, 2 Paige, Ch. 67; Hardin v. Boyd, 113 U. S. 771.

Complainants' remedy was by supplemental bill, and they could have set up the new facts as charged in the amendment. Shephard v. Merril, 3 Johns. Ch. 423; Bowen v. Idly, 6 Paige, Ch. 49; Walden v. Bodly, 14 Pet. 160.

The act of the legislature, Laws, 1889, section 8, page 317, has no application to the case at bar; it applies only to candidates for office. Calaveras County v. Brockway, 30 Cal. 337.

Fraud and bribery must be charged distinctly, and with certainty, that the respondent may be apprised of all the facts which he is required to meet. 1 Danl. Ch. Pl. & Pr., sec. 324; Story, Eq. Pl., secs. 255–257. See, also, Moore v. Green, 19 How. 69; Harding v. Handy, 11 Wheat. 103.

The hearsay testimony should have been excluded and the direct and positive denial of the voters taken, and their votes allowed to stand as cast and counted. Gilleland v. Schuyler, 9 Kan. 569; Tarbox v. Sughrue, 12 Pac. Rep. 935; People v. Commissioners, 7 Colo. 190; Norwood v. Kenfield, 30 Cal. 398; McCrary on Elec., secs. 270, 271; State v. Deniston, 26 Pac. Rep. 743. See, also, Little v. Robbins, 2 Cong. Elec. Con. 138; Gooding v. Wilson, 4 Id. 79; Strobach v. Herbert, 6 Id. 7; Norris v. Hanley, 4 Id. 75; Ingersol v. Naylor, 2 Id. 33.

If the lots were sold for $1 each to electors, not in the way of a bribe, and without any understanding, either expressed or implied, that they should vote for Junction City, then the sale was legal and proper. United States v. Foster, 6 Fed. Rep. 247; State v. Deniston, 26 Pac. Rep. 742; Tarbox v. Sughrue, 12 Id. 935; Blue v. Peter, 20 Pac. Rep. 450; Paine on Elec., secs. 770, 774, 775.

On the subject of bribery and undue influence, see 6 Am. and Eng. Encyclopedia of Law, 360–375.

Fraud and bribery will not be presumed; they must be proved, and the burden of proof is on the complainants. Frost v. Metcalf, 5 Cong. Elec. Cas. 439.

Perea v. Gallegos, 5 N. M. 102, is not applicable to the case at bar. In that case the counsel moving for leave to amend made affidavit setting out the grounds fully.

EDWARD L. BARTLETT for appellees.

Amendments to the bill in order that it might conform to the proof taken, are distinctly allowed by the statute. Comp. Laws, sec. 1911; Perea v. Gallegos, 5 N. M. 102. See, also, Equity Rule 40 of this court; Lyon v. Tallmadge, 1 Johns. Ch. 184; Hardin v. Boyd, 113 U. S. 756; Mix v. People, 4 N. E. Rep. (Ill.) 783; Church v. Holcomb, 7 N. W. Rep. (Mich.) 167, 173; 6 Am. and Eng. Encyclopedia of Law, 807, 808; Connalley v. Peck, 3 Cal. 75; Midmer v. Midmer's Ex'rs, 11 C. E. Green, Eq. (N. J.) 299; 1 Danl. Ch. Pl. & Pr. 418, and cases cited; 1 Bar. Ch. Prac. 213, 214; Sweatt v. Faville, 23 Iowa, 326–328.

Under the old law, section 1170, Compiled Laws, the contestant was required to specify the names of the voters whose votes he intended to challenge; but the law as it now stands only requires the notice to set forth the grounds upon which the contest is based. Sec. 8, chap. 135, p. 317, Laws, 1889. See, also, Story, Eq. Pl., sec. 28; Camden & Amboy Railroad v. Stewart, 4 C. E. Green, Eq. (N. J.) 346.

In England, and in several of the states the declarations of voters are admitted, as being parties, and against their interests, and in regard to matters of public and general policy. McCrary on Elec., secs. 448, 449; 6 Am. and Eng. Encyclopedia of Law, pp.

429, 436;  Patton v. Coates, 41 Ark. 111; People
v. Pease, 27 N. Y. 45;  State v. Olin, 23 Wis. 319;
Beardstown v. Virginia, 81 Ill. 541.

In this case the court sat as a jury; and where
there is sufficient legal evidence in the record to sustain
the decree, the presumption is that on the final hearing
the chancellor considered the legal evidence only.
Sawyer v. Campbell, 2 N. E. Rep. (Ill.) 660.

In an election contest all votes obtained by "pay-
ing or agreeing to pay money or property or anything
of value therefor" will be rejected upon proper proof,
by the court or tribunal trying the case.  McCrary on
Elec., secs. 180, 181;  State v. Olin, 23 Wis. 319, 327;
People v. Pease, 27 N. Y. App. 45, 52, 69, 71; State
v. Purdy, 36 Wis. 218;  City v. City, 81 Ill. 549, 550;
State ex rel. Sullivan, 23 Pac. Rep. 1054–1060.  See,
also, 6 Am. and Eng. Encyclopedia of Law, p. 336, and
notes; Id., 372, and notes.

The jury may infer such an agreement from the
circumstances of the case, even in a criminal prosecu-
tion for bribery.  Roscoe's Crim. Ev. 327.

The findings of fact, by the court sitting as a jury,
are conclusive.  Sawyer v. Campbell, 2 N. E. Rep.
(Ill.) 660.

### OPINION OF TRIAL JUDGE.

SEEDS, J.—"According to chapter 7 of the Laws of
1889 of this territory, the legal voters of San Juan
county were authorized, at the general election of 1890,
to vote upon the question of locating a permanent
county seat for their county.  In accordance with the
requirements of that law, a vote was had upon Novem-
ber 4, 1890, that being the general election, there being
three places voted for, to wit, Junction City, Aztec,
and Farmington.  The board of county canvassers
duly declared Junction City as the county seat, it hav-
ing a majority of nine over Aztec, the next nearest

competitor. The county seat had been temporarily located at Aztec. Upon the declaration of the result, the complainants herein instituted proceedings in equity to restrain the defendants, who were officials of the county, from removing the records from Aztec to Junction City, and for such other and further relief as may be equitable in the premises. A temporary injunction was allowed, but upon the hearing it was dissolved, and the records were removed to Junction City. There were various amendments allowed to the bill, after which the case was referred to an examiner to take testimony. Testimony was taken during the months of August and September, 1891. After the testimony was closed, the complainants asked leave to amend their bill to make its allegations conform to the testimony. The defendants objected to the allowance of this amendment, both by motion to strike out and by saving their rights in their answer. The defendants asked more time to take further testimony. During the taking of this testimony the complainants introduced evidence tending to show that three persons who had voted for Junction City were not at that time citizens of the United States. Thereupon they asked leave to amend their bill again to conform their allegations to the proof. To this request the defendants objected. Upon an intimation from the court that, if it granted the amendment, it would give the defendants more time to take testimony, the complainants withdrew their motion, insisting that the proof was material and seasonable upon the general allegations of the bill. At the hearing the defendants first insisted upon their motion to strike the amendment from the files, which was filed after the taking of the testimony.

ELECTION to locate county seat: pleading: evidence. Upon that motion I am first to pass. Before doing so, however, it will be necessary to look at the allegations of the pleadings which are legally, and unquestioned, in the case.

In the original bill upon which the injunction was asked, it is alleged 'that at such pretended election * * * numbers of illegal and fraudulent ballots were cast, which ought not to have been received or counted by the judges of election of the various precincts.' Then there is an allegation that one Sam Johnson had voted for the place known as 'Junction City,' who had only been in the territory forty days; and, continuing, the bill says 'that numerous other persons, to your orators unknown, likewise voted illegally and fraudulently at such election, and voted in favor of the location of the county seat at the place known as "Junction City;" that there were more than enough of such illegal and fraudulent ballots cast for the location of the county seat at Junction City to change the result,' etc. They further allege that certain parties interested in Junction City 'illegally and fraudulently bribed and bought a large number of the legal voters * * * to cast their ballots in favor of said place known as "Junction City," instead of the town of Aztec;' and then they set out by what means they bribed the persons alleged to have been illegal voters. In their first amendment to the bill they go on to specifically name who were illegal voters, and whether so by reason of noncitizenship, minority, or bribery.

"When, then, the complainants introduced testimony as to any other parties than those already named in the bill and its first amendment, the defendants objected because there was no allegation as to those parties, and now strenuously contend that it is too late to amend the bill to conform with that proof. The contention of the defendants is, in the first place, that there can be no evidence as to illegal voting, unless the party as to whom the evidence applies is first named in the bill. Is this contention sound? There is no statute requiring the naming of the parties in an action of this character. By section 1170, Compiled

Laws, 1884, any candidate at an election could contest
the election of his opponent by giving him notice, in
which notice he was to give the names of the voters
and the objections upon which he based his contest.
The notice was, in fact, his petition.  But by section
8, chapter 135, Laws, 1889, this was changed, so that
now the contestant only has to set forth the grounds
upon which he bases his contest.  So, by no rule of
analogy can it be said that in such a proceeding as this
the complainants are bound to give the names of those
who cast illegal votes.  Is it required by any rule of
pleading?  But by every rule of pleading it is required
that the allegations should be of ultimate facts, not of
those facts which are simply testimony, and tend to
prove the ultimate fact.  It is true that pleading legal
conclusions, or fraud generally, is forbidden, and, if
taken advantage of by motion or demurrer, may cause
the bill to be dismissed or amended.  But in this case
there has been no objection to the allegations of
the bill, but are not the allegations of the bill
as above set out substantially good?  What is the
cause of action?  The statute under which this vote
was taken says legal voters shall vote.  If, then, illegal
votes are cast, they should not be counted for the place
for which they are cast.  How should you allege that
fact?  By simply stating that a person or persons did
cast an illegal vote.  It makes no difference who cast
it; if it was illegal, that is sufficient.  It possibly would
have been bad pleading to have alleged generally that
there was illegal voting, or fraudulent voting; but
there can be no objection to alleging illegality or fraud
when the means by which it was accomplished is fully
alleged, as it most certainly is in this bill.  So, inde-
pendent of the amendments, as long as the case was
open for taking testimony, the complainants were
legally entitled, under the allegations of their bill, to
prove that persons were bribed to vote, or were not

citizens, and therefore that the ballots cast by them were illegal; and all objections interposed to the reception of evidence, because there was no allegation as to specific persons in the bill, are overruled.

"But, even if I am wrong as to this proposition, I am convinced that the complainants had a perfect right to file the amendments which they have, including the last one withdrawn by them. The ground AMENDMENTS: upon which the defendants contend that pleading. the amendments should be excluded is that at the time they were offered the testimony was closed, and it was too late. The old rule undoubtedly was: 'An order for leave to amend a bill may be obtained at any time before answer, upon motion or petition without notice; and, for the purpose of adding parties only, an order for leave to amend may be obtained in like manner at any time before the cause is set down for hearing;' also 'an order for leave to amend a bill, only for the purpose of rectifying some sclerical error in names, dates, or sums, may b obtained at any time.' 1 Daniel, Ch. Pl. & Pr. [4 Ed.], pp. 409, 410, 416; 6 Am. and Eng. Encyclopedia Law, p. 807. This was undoubtedly the common law rule, and, strictly, no amendments were allowed after the testimony was in, except as above set out. But that this was not an inflexible rule is evident from the fact that courts had gone so far upon the hearing of an appeal as to allow the plaintiff to change his bill into an information and bill, or information only. 1 Daniel, Ch. Pl. & Pr., p. 418.

"But that this rule has been materially changed and made more liberal by statutes and adjudications admits of no doubt. The rule now undoubtedly is that all amendments which do not change the substantial character of the bill, or which tend to further the ends of justice, are permissible, resting in the sound discretion of the chancellor, at any time previous to the

entering of the decree. 6 Am. and Eng. Encyclopedia Law, pp. 807, 808. Church v. Holcomb, 7 N. W. Rep. (Mich.) 167–173; Hardin v. Boyd, 113 U. S. 756, 5 Sup. Ct. Rep. 771. It is said that an amendment may be filed after the case is decided. Sawyer v. Campbell, 2 N. E. Rep. (Ill. Sup.) 660. And it is held error not to allow the complainant to amend at hearing to correspond with proof. Mix v. People, 4 N. E. Rep. (Ill. Sup.) 783. In the case of Hardin v. Boyd, supra, the error alleged was that the chancellor at the hearing had allowed the complainants to amend the prayer of their bill asking for something not contemplated by the allegations of the bill.

"In passing upon this point, which the court held not to be error, Mr. Justice Harlan says: 'It may be said, generally, that in passing upon applications to amend, the ends of justice should never be sacrificed to mere form, or by too rigid an adherence to technical rules of practice. Undoubtedly great caution should be exercised where the application comes after the litigation has continued for some time, or when the granting of it would cause serious inconvenience or expense to the opposite side. And an amendment should rarely, if ever, be permitted where it would materially change the very substance of the case made by the bill, and to which the parties have directed their proofs.' The rule is thus stated in Lyon v. Tallmadge, 1 Johns. Ch. 184, 188: 'If the bill be found defective in its prayer for relief, or in proper parties, or in the omission or statement of facts or circumstances connected with the substance of the case, but not forming the substance itself, the amendment is usually granted. But the substance of the bill must contain ground for relief. There must be equity in the case, when fully stated and correctly applied to the proper parties, sufficient to warrant a decree.' Pages 761, 762, and 773. If, now, this is good law, wherein does the request in this

case to file amendments come in conflict with it? The testimony is all in, the expense is all made, and there is no showing of inconvenience. Will it change the substance of the case as made by the bill, and to which the parties have directed their proof? The substance of the bill, and to which the proof was directed, is that A. and B. cast illegal votes, that C. and D. were bribed, and their votes were illegal. Now, does it change this to say that E. and F. also did the same, or were likewise bribed? Does not the original bill and first amendment, over which there is no contention, and which the defendants have in no manner attacked, contain grounds for relief, if proven, and is there not equity sufficient alleged upon which to ground a decree? There certainly is, and hence it would be error, under this authority, for the court to refuse the amendments.

"But there is yet a further reason why these amendments should be granted. Our statute plainly gives the right to file such amendments to make the proofs correspond with the allegations, where the new allegations do not change the substance of the bill, or make an entirely new issue so late in the course of the controversy as, from that very fact, to work injustice to the opposite side. The statute reads: 'Each party, by leave of the court, shall have leave to amend, upon such terms as the court may think proper, at any time before verdict, judgment, or decree.' Section 1911, Compiled Laws, 1884. Evidently this statute was passed for a purpose. What was it? Clearly to enlarge the rights granted in pleading by the common law. As seen above, the general rule forbids amendments in equity cases after the taking of testimony, except as to parties and clerical errors; hence, it must be presumed that this statute was to grant something other than that which then existed. It does not exclude such amendments as those in question; hence, it must

contemplate them. I understand that the case of Perea v. Gallegos, 5 N. M. 102, fully sustains this position. The court quotes approvingly from Connalley v. Peck, as follows: 'Where the proof does not sustain the allegations of the bill, and where, by the proof, the complainant would be entitled to relief in a court of equity, if his pleadings had been properly framed, an amendment should be allowed or directed to conform the pleadings to the facts which ought to be in issue in order to enable the court to decree fully on the merits, and, whenever this is not done, it is error.' 3 Cal. 75. Also, 'where a matter has not been put in issue with sufficient precision, the court has, upon hearing the cause, given the plaintiff liberty to amend the bill, for the purpose of making the necessary alteration.' 1 Daniel, Ch. Pr. 418; Lewis v. Darling, 16 How. 1.

"The defendants insist that this case is not in point because of the character of the affidavit upon which the court granted or refused the amendment. Of course, each case must rest upon its own facts, and the decision must primarily relate to those facts, but usually the law declared is of general application. It is undoubtedly true that an affidavit may be insufficient, and because thereof the leave to file the amendment will not be granted. But that is not the contention here; the defendants nowhere by their motion raise that question. The cited case declares the law plainly, that, after testimony is all taken, the bill may be amended in other ways than by merely adding parties or correcting clerical errors. That is now the law of this territory. Against this proposition the defendants contended by their motion.

"It is finally urged that the matter should have been set up by a supplemental bill, and not by amendment. It is unnecessary to go into a consideration of the question as to when such a pleading is proper. It

may be conceded that new matter, arising after the
filing of the bill, presenting new equities, under the
general rule, should be pleaded by a supplemental bill.
But that is not this case; all the matter here pleaded
was in existence, for all its effective purposes, before
the bill was filed. The mere fact that it became known
to the complainants afterward does not alter the case.
The statute was intended in all probability to meet just
such a case. The defendant's motion is therefore
overruled. And, if the complainants think proper,
they are granted leave to file the amendment of
———, which was withdrawn at a suggestion of the
court, which was clearly erroneous, and have it filed
as of that date.

"I shall now proceed to consider the evidence
offered by the complainants to sustain their issues.
The record is very voluminous, as there were over one
fifth of the voters in the county examined
at the various examinations. A great deal
of the testimony is hearsay, beliefs, and suppositions
and conjecture. I have given all of it a patient and
careful study, and endeavored to arrive at the truth as
it is to be found in the proof. Under the pleadings
and proofs, the evidence may satisfactorily be consid-
ered under two heads: First, that in reference to
alleged illegal votes cast by nonresidents, by those
who were not citizens, and those who were not of age;
and, second, that in reference to those votes which
were cast by parties who are alleged to have been in-
fluenced by the selling or giving to them of lots in the
places voted for.

"As to the first it is alleged that one Sam Johnson
voted for Junction City, and was not at the time a
citizen. The burden is, of course, upon the party at-
tacking a person's vote to prove that it is illegal. When
a person votes, the presumption is that he is a legal

DECLARATIONS of
voter: evidence.

voter. This man Johnson voted. There is evidence that he told one Berry and one Boat, just after the election, that he voted for Junction City, and that he had said he was not a resident. This evidence, standing alone, is, under my holding, inadmissible. There is evidence, though, that he was never in the county until some thirty or forty days before the election; that he was never seen there before. After the election he was arrested for illegal voting, and pleaded guilty to the charge. This was proved by the docket of the justice, and is sufficient. The defense, however, introduces an affidavit made by this Johnson sometime afterward, in which he states that he was a citizen by naturalization, and had been for five years in San Juan county, and that when he pleaded guilty to illegal voting he was drunk. I can not see how this affidavit can be considered as evidence. There is no rule of evidence that would allow of its admission, especially as there is no showing that there was any attempt made to take his deposition. The affidavit must be excluded. However, either with or without it, I am confident that he was not a legal citizen of San Juan county, and therefore not entitled to vote. Did he vote for Junction City? I do not think there is any legal proof that he did, but as the defendants in their answer have admitted that he did, there is no need of proof. His vote should be deducted from the number cast for Junction City.

" It is alleged that Jose Pablo Gallegos voted for Junction City, and that he was not then of age. It was attempted to prove this fact by the certificate of CERTIFICATE of the priest who baptized him. In my priest: evidence. judgment, that certificate was inadmissible. But one Lovato, his cousin, testified positively that he was living at the same place that Gallegos was when he was born, and that he knew that he was born

sometime in January, 1870.   He is not contradicted
PLEADINGS:      or impeached, and I see no reason why I
   evidence.      should not believe him.   The voter was
not, then, of age when he voted.   But did he vote for
Junction City?   There is no evidence, except that he
told Berry that he did.   But the bill charges that he .
voted for Junction City, and the answer fails to deny
it; hence it must be presumed that he did so.   His
vote should be rejected.

"Edward Thomas, Sr., and Edward Thomas, Jr.,
both voted for Junction City, as they both testified;
QUALIFICATION of  but at the time the senior Thomas had
voters: certifi-  not taken out his last papers, but he took
cate of citizen-
   ship.         them out in October, 1891, following the
election.   The junior Thomas took out his citizenship
papers at the same time.   Andrew Miller testified that
he took out his first papers in 1877, but only took out
his last papers in October, 1891; that he voted for
Junction City.   Max Wenzel testified that he voted for
Junction City; that he was a foreigner, coming to this
country when only sixteen years of age, and at once
took out his declaratory papers; that he served from
1884 to 1887 in the marine service of the United States.
It is alleged by the complainants that all four of these
parties were illegal voters, and their votes should be
rejected.   Were they entitled to vote?   By section 1141,
Compiled Laws, 1884, it is provided that no person
prevented by the organic law shall be entitled to vote
in this territory.   Section 6 of the organic law pro-
vides that after the first election the territorial legisla-
ture shall prescribe the qualifications of voters,
'provided that the right of suffrage and holding office
shall be exercised only by citizens of the United States,'
etc.; and by section 2004 of the Revised Statutes of
the United States it is provided 'that all citizens of the
United States who are otherwise qualified by law to
vote at any election by the people in any   *   *   *

territory * * * shall be entitled and allowed to vote. * * * ' It is provided by section 2165 of the Revised Statutes of the United States how foreigners may become citizens. They must, if over twenty-one years of age, with one or two exceptions, make a preliminary statement of their intention to become citizens at least two years before being legally made citizens. The declaration of intention does not make a person a citizen; hence the senior Thomas and Andrew Miller were not citizens when they voted, and under the laws of this territory, their votes were illegal. The law further provides that all children under the age of twenty-one years, living in the United States when their parents became naturalized, are also made citizens by that act. But the elder Thomas was naturalized after the junior Thomas had reached his majority; hence, he is not saved by this proviso, and his vote was clearly illegal. It is contended for Wenzel that his services in the marine service from 1884 to 1887, together with his declaration of intention to become a citizen, makes of him a bona fide citizen. But CITIZENSHIP: there are two serious objections to this proof. contention: First, the certificate of his intention to become a citizen is the only proof receivable of that fact; and, second, admitting that the marine service, as testified to by him, is understood by QUALIFICATION 'armies of the United States,' the pro- of voters: section 2166 Revised vision of the law in regard to such service Stat. U. S. construed. is that any alien over the age of twenty-one who has enlisted and been honorably discharged, may become a citizen after one year's residence, without any previous declaration of intention to become a citizen. Section 2166, Rev. Stat. U. S. All the privilege given by such service is to do away with the declaration of intention, and residing five years in the country. Wenzel's vote was therefore illegal.

"It is alleged that one Simon Stonebarger voted for Junction City, and at the time was not a legal voter in San Juan county. By his own uncontradicted evidence he voted for Junction City, and he came into San Juan county to live upon September 3, 1890. The election was held upon November 4, 1890, so that he had only been a resident of the county two months. Section 1214, Compiled Laws, 1884, defines the 'legal voter' as a citizen of the United States, of the age of twenty-one years, who shall have resided in the territory six months, in the county in which he offers to vote three months, and in the precinct thirty days immediately preceding the election. In accordance with this, it is very clear that, at the time of voting, Mr. Stonebarger was not a legal voter of San Juan county. This concludes the evidence as to all illegal voting under the first head, except as to one Norris, whose case I shall consider, together with that of the defense, in regard to some alleged illegal votes of a like character.

"I now come to consider the evidence referring to those votes, which, it is alleged, were cast for Junction City because of undue influence and bribery. At the PARTIES to record: evidence. threshold of the inquiry we must definitely settle upon the character of evidence which is to be admitted to prove that the votes were cast, what place they were cast for, and why they were cast. It must be presumed, at first, that every vote was legally cast, and the complainant must prove, by a preponderance of credible testimony, that the votes which they attack as illegal are in fact so. A good deal of the evidence introduced to prove these facts is what, upon general principles of evidence, would be rejected as hearsay. But the complainants insist that, under the rule adopted by the weight of authority in this country, such evidence is admitted, and should be in this case. The question has never, I believe, been

passed upon in this jurisdiction, and hence should not now be thoughtlessly passed over. The well settled rules of evidence should not be changed or modified without some great necessity imperatively demanding it; neither should such rules be allowed to stand as a bulwark for wrong, when by a modification more good than wrong can be accomplished. There are two distinct lines of decisions upon this mooted question in this country. The question in its essence is, can the declarations of the voter, made upon election day or thereafter, as to where he voted, for whom, and as to his qualifications, be given in evidence in a proceeding not directly referring to his action? In the states of New York and Wisconsin, and in England, the question is answered in the affirmative. They place their decisions upon the ground that the voter is a party to the action, and hence that his declarations are always admissible. People v. Pease, 27 N. Y. 45; State v. Olin, 23 Wis. 319. In Kansas and Colorado the answer is emphatically in the negative. Gilleland v. Schuyler, 9 Kan. 569; People v. Commissioners, 7 Colo. 190.

"In the Kansas case, Judge BREWER, now upon the United States supreme bench, says: 'That so much of this testimony as purports to give the statements of third parties, as to the number of times and the names under which they voted, is hearsay and incompetent, seems to us clear. * * * These declarations are not made at the polls by persons conducting the election, and so as to make part of the res gestae; nor do they accompany a principal fact which they seem to qualify or explain. * * * It may be said that the contest was between Lyndon and Burlingame, and that all persons supporting either were principals on one side or the other. But this is true no more in case of a contest between towns for the county seat than between individuals for an office. Surely, a

candidate for the office of governor would hardly feel
that all who voted for him so far represented him that,
in case of a contest, their admissions and statements
could bind him on the question of fraudulent votes.'
In Illinois the rule adopted by those states, upholding
the legality of such evidence, has been modified so that
the voter may be considered a party as against the con-
testant, and his declarations showing his want of qual-
ifications to vote may be shown after first proving
by evidence aliunde that he voted adversely to the con-
testant. Beardstown v. Virginia, 81 Ill. 541. In the
case of Cessna v. Myers, a contest in the forty-second
congress, the rule allowing this evidence, at least in
the broad manner in which in England, and by the
courts of New York and Wisconsin, it is sustained, is
very intelligently criticised; and the text-writers would
seem to doubt its correctness. McCrary, Elec. 448;
Paine, Elec. 770, 773, 774. I am clearly of the opin-
ion that the rule, as adopted by the English, New
York, and Wisconsin courts, is wrong, and could be
made the means of doing incalculable harm.

"But I can also see where illegal and fraudulent
voting could fail of being proven, if such evidence was
entirely excluded. While I think that probably Judge
BREWER's statement as to the voter not being a party in
a contest between individuals for an office may be cor-
rect, I do not give in my adhesion to his statement that
he is not a party in a contest for the place for county
seat. Who are the parties to this suit,—that is, the real
parties whose interests are at stake? Are they the
officers who are defendants, and who hold the offices?
What difference does it make to their salary or their
honor—all they have in the office—whether the county
seat is at Junction City or at Aztec? Are the complain-
ants the real parties in interest? Who are they? Sim-
ply property holders. Then is a county seat located
for the benefit of property holders simply? If so, why,

then, are not all those who have property in the place
parties to the action, whether upon the record or not?
And, if they are, then all, at least, who had property
in the place would be parties to the action, and their
declarations would be admissible. If a county seat is
not located for the property holders, and it certainly is
not, who is it located for? Primarily for all in the
county. But they may have different choices; so
when they vote for different places, and there is a con-
test as to which place is chosen, all who vote for the
different places must be parties as to that place. Hence
in a contest only those who appear upon the record are
parties to it, or all who vote for a place are. Take the
case at bar. Supposing that all the officers who are
made defendants were partisans of Aztec, and they
should make declarations to the effect that they voted
for Junction City and were bribed, while the fact was
that they had not, yet the declarations would be admis-
sible, though they have no interest in the case any
more than any other citizens, but were made parties ex
necessitate. The places themselves can not be parties,
because they were not incorporated. But suppose they
had been, and the town council of Aztec had begun
this suit; would the declarations of the councilmen
that they had voted illegally have been received? They
could not have been received as declarations of a
councilman as such, for he does not vote as a council-
man, and hence can not make a declaration as a coun-
cilman. But he is a party to the suit, not as a voter,
but as a councilman. How, then, can you logically
introduce his declaration? The fact is that unless the
voters who cast their votes for certain places are, in a
contest, all parties, you have this anomaly; that a
place may be prejudiced by the declarations of persons
who in no sense represent it, while the same place may
be further prejudiced by its inability to put in evidence
the declarations of the nominal parties to the record,

yet who are not the real parties, as in the supposed case of the city council. It seems to me, then, that, in cases like the one at bar, all persons voting for a place are parties to an action between those places, so as to introduce their declarations as to their qualifications and motives in voting, after the fact of their voting for the place has been proven by evidence aliunde. I am satisfied that the rule adopted by the Illinois court is nearer the true rule. All evidence, therefore, upon this record which goes to show that a person said he voted for one or the other of the two places—Junction City or Aztec,—and that he was an illegal voter, or was bribed, will be excluded, unless there is competent evidence aliunde that the person did vote, and voted for the place alleged.

"I find then, that, under the second head of illegal voters charged by the complainants, the testimony shows that there were two classes of such voters: First. Those who testify themselves that they voted for Junction City, and that they received certificates for lots previous to casting their votes for that place. They also testify that they were not influenced in casting their votes by the reception of the certificates. Under this class I find the following who cast votes for Junction City: Juan de Jesus Valdez, Antonio Medina, J. P. Martin, Eleuterio Vigil, Doreteo Sanchez, Juan B. Valdez, J. Francisco Martinez. Second. Those who testify that they voted for Junction City, and received certificates for lots before so voting, but deny that their votes were influenced thereby, and concerning whom others testify as to their declarations that they were influenced in their voting by the gift of the certificate. Under this class I find the following who cast votes for Junction City: Joseph Guyer, J. Benito Larragoite, W. B. Firebaugh, Santiago Martinez, Frank Allen, Martin Pacheco, Felipe Gallegos, J. Nicanor Chavez, J. Maria Quintana. It should be said that all these

parties deny, in substance, that they ever made the declarations testified to.

"All the witnesses stand upon the record unimpeached, and their testimony must be taken as true, except where surrounding conditions are such, and the other facts, which must be believed, are of such potent force, as to irresistibly compel the mind to believe that the testimony is colored, biased, suppressive of part of the truth, or untrue. There was much agitation in the county for two months previous to the election, and for three or four months thereafter, and it is a safe conclusion from the evidence that voters who could talk, had talked a good deal about the election for county seat. Of the nine persons whom I have placed under the second class, the testimony shows positively, that seven of them declared, in the presence of from two to three others, that they had voted for Junction City for the gift of lots, or the certificates for lots. Each one of the seven denies these declarations. Who are to be believed? The parties who give the testimony as to the declarations are corroborated as to the voting, and for which place the vote was given, by the parties themselves. There is nothing improbable in the fact that they did vote because of the gift of lots, and there is not a scintilla of evidence that the persons testifying to the declarations were telling a falsehood or manufacturing testimony. Even admitting that these witnesses were all partisans of Aztec,—and it is not shown that they were,—there is not as great a presumption that they would deliberately commit perjury to accomplish their ends as there is that parties who have made a statement that might convict them of an illegal act would deny that statement to protect themselves. So that it in substance, comes to this: That two or more unimpeached witnesses testify to one state of facts, and one equally as good witness testifies to an opposite state of facts. I am bound to believe the two. I firmly

believe, upon the evidence, that seven of these voters made the declaration that they ,voted for Junction City for an inducement. Upon the other hand, upon the stand they peremptorily deny that they were so influenced. Hence it will be necessary to inquire into the testimony upon the question of bribery before finally passing upon the character of these votes. As to two of the voters in this class, only one witness testifies that they made declarations, which they deny. Upon general principles, this testimony would fail, and it will unless upon the whole proof the presumption in favor of it is made more positive.

"We now come to the crucial question in this case: Did the partisans of Junction City hold out induce-

BRIBERY:
evidence.

ments to the voters of San Juan county to vote in favor of their locality, and were these inducements in the nature of a bribe or undue influence, and did the voters above named receive the inducement as the moving cause of their voting for Junction City? If this question be resolved in the affirmative, then these votes must be deducted from the vote of Junction City. The testimony establishes the following facts beyond a doubt: That, up to two or three months before the date of the election, there was no such place in existence as Junction City, nor was there one contemplated. That about that time a company was organized which purchased land at that place, and platted it as a city, and gave a large square for county purposes. That the president, or at least the acting president, of the company was one L. W. Coe. This company, through its officers, made a proposition to the voters of San Juan county that, if they would locate the county seat at this place, where as yet no one resided, and the lots were not disposed of, they would bind themselves (and I believe they did so bind themselves) to build the necessary county buildings for the use of the county, and to con-

struct suitable bridges across the San Juan and Animas rivers, which unite near this place and form a junction. Right here it must be said that this was a direct and unequivocal inducement to the voters to vote for Junction City, and shows that this was its purpose. I mention this as showing clearly that the members of the company at the inception of their undertaking were making inducements for votes, and as tending to characterize all their actions. Not that this inducement was illegal, for, while it was once thought to be so, the courts have decided that, as the individual voter received nothing perceptible, he was not bribed, and hence such offers were not illegal. The company, then, induced a number of persons to sign a manifesto, with themselves, to the voters of San Juan county, which was scattered abroad throughout the county, setting forth the advantages of Junction City, and almost at the opening saying: 'We are aware that it is every person's duty to vote for his own interest, as a matter of justice to himself, and for that reason we would ask you to join us in a consultation, to see if we can not convince you that it is to the best interest of every voter of the county to make this place the county seat.' Standing by itself, there is nothing wrong in the manifesto or in this excerpt taken from it. But it is noticeable that it is founded upon the interest of the voter. Now, a voter may have various reasons for voting for one place in preference to another, but those reasons are generally based upon interest. And the greatest interest a man can have in a place is a property interest. Anything which will enhance the value of that property, with little or no cost to himself, he is anxious for. Hence, if a person has lots in a town, and by voting a county seat there he can enhance the value of them, it is not only his pleasure to do so, but, from a business point of view, it is his duty to do so. About the beginning of October, 1890, or about

a month before the election, and after this manifesto was issued, the company began to issue the following certificates:

"'October 6, 1890.

"'This is to certify that I have this day sold to (here the name) lots numbers 21, 22, all in block number 17, in the town plat of Junction City, San Juan county, New Mexico.

"'L. W. COE,

"'President of the Town Board of Junction City.

"'Price, $1.00 per lot.'

"The proof is clear and satisfactory that for these certificates the parties never paid anything. Coe testifies that they quit issuing certificates the day before the election. He also says that the parties were told that they must present their certificates on or before January 1, 1891, or they could not get deeds; and there were one or two who did present them after that time, and were refused. When they got their deeds they paid the one dollar per lot. The actual value of the lots was much higher. The testimony shows that the lots were assessed at $10 each. Mr. Locke testifies that some of the lots sold as high as $200. Others sold the certificates for prices ranging from $3 a lot to $12. If the evidence as to the value of the lots is good for anything, it is beyond doubt true that the one-dollar price was purely nominal, and so inadequate as to cast suspicion upon the whole transaction.

"Yet it is possible that the whole matter of the sale of the lots was a purely business transaction, entirely divorced from the question of the location of the county seat. Was it? I will consider a small portion of the testimony upon this point. Mr. Coe testifies: 'Mr. Schreck had a long conversation with me in regard to the county seat, and conveyed the

idea to me that he was a Junction City man. Finally he asked me for a certificate. He asked me if it obligated him to vote for Junction City. I told him that it did not; that it was his privilege to vote for what he pleased; that we were selling these tickets to everybody; that we were going to build a town at Junction City, whether we got the county seat or not.' He further testifies that he kept no record of the certificates issued; and that he authorized one Laughren to say to the La Plata people that 'we were willing to sell lots at one dollar each, and all the people upon the La Plata who wanted lots in Junction City could have them at that price.' All the defendants' witnesses, upon the question of the sale of the lots, testify that there was no inducement for selling them at such a figure, and that they never asked anyone to vote for Junction City for the lots. This, it may be conceded, is established in their favor, as far as words go. But what do their acts say? Mr. Coe's testimony suggests a few inquiries to me, passing upon the facts as a juror. How does it happen that the gentleman who asked him for a certificate inquired if it obligated him to vote for Junction City? If nothing was said as to that, if it was a purely business transaction, how happens it that such a question should obtrude itself? Either one of three explanations must be vouchsafed— First, that they had been talking of his voting for Junction City for the lot; or, second, that the man Schreck was seeking to have a bid for his vote; or, third, that the transaction was so palpably wanting as to a consideration as that Schreck could conceive of no other reason. Mr. Coe's testimony makes a statement which is borne out by every word of testimony before me, and that is this: That the question of selling lots never came up, except in connection with the other question of voting for Junction City. It is insisted that this was to found a town simply, and had

no relation to the county-seat vote, yet by diligent search through the two hundred pages of testimony I fail to find one instance where a certificate was given that was not so given after or at the time of a conversation about voting for the county seat at Junction City. But Mr. Coe explains why he did not ask the parties to vote for Junction City for the lots,—'because they were going to build a town there whether they got the county seat or not.' Now, if this is so, how comes it that the certificates were limited as to time in which to obtain a deed? If it was a bona fide sale to found a town upon, what was the idea in limiting the time in which to get a deed? If the lot was sold, and for a valuable consideration, how could the company refuse a deed? How comes it that, if it was the idea to build a town in any emergency, the company did not give deeds at once? Why wait until after election? What was the object in issuing certificates up to election day, and then stopping? Why, unless there was some relation to that day, stop at that day rather than Christmas? Then, again, why did the company neglect to keep a record of the lots sold? It is noticeable that the price of the lots was placed after the signature of the president upon the certificate, and the certificate nowhere calls for a deed upon a consideration, and in any case there is nothing in the certificates which compels the grantee to take the lots. Yet it is contended that it was a pure business transaction, with the single purpose of disposing of lots in a place where there was to be a town in any emergency.

"But let us see how this contention is borne out by other testimony. A Mr. Laughren was an agent for Junction City, going about the country urging its claims. He was authorized by Mr. Coe to sell lots, by giving certificates, for the testimony is overwhelming that for the certificates nothing was given. One Joseph Sterret had testified that Laughren had offered him

four lots in Junction City to vote for it. Here is Laughren's testimony upon that point: 'I say that I never mentioned Junction City or lots to Joe Sterret in one way or the other. I knew that he belonged to the Aztec town board, and there was no need for me to offer him any inducements down here. That's the reason I didn't mention town lots to him at all.' This witness was evidently using 'inducements' to gain votes. Two others of the defendants' witnesses testify, —the one, that he was placing certificates to get the people interested in Junction City; the other, that Coe offered him certificates, saying that the lots would cost him nothing, but that he would have to pay one dollar a piece for making the documents, and that Coe sent a certificate by him to another voter, saying 'he wanted everybody in San Juan county interested in the Junction City town site;' while one of the complainants' witnesses testifies, and it is not denied, that Mr. Coe said, when giving certificates to certain parties, 'that they wanted men interested as much as possible, so that they would vote where their interest was.'

"That the price for the lot was merely nominal, in no manner representing its real worth, is too evident to admit of controversy. But it is very questionable from the evidence if that one dollar was ever intended to be for the lot. Mr. Locke made out the deeds under a contract with the company, and there is but very little evidence that the person who held the certificate paid for making the deed, while one of the defendants' own witnesses says that Coe told him that the one dollar was for making the documents. The evidence can point to but one of two conclusions,— either the giving of the certificates was a pure piece of business, or else it was done with the evident intention of influencing the voters to vote for Junction City. To hold to the first conclusion would be to declare that the town company lacked ordinary intelligence; to·

refuse to believe the testimony of my senses; to say that the people of San Juan county are not governed by the motives which exist among other people. I am fully convinced that the certificates were given for the purpose of influencing votes; that it was intended as an inducement, just as much as the promise to build county buildings and bridges. The last is allowable, the first is legally wrong.

"Now, however, the question presents itself, were the persons whom the testimony shows received the certificates and lots, or the certificates only, guilty of receiving a bribe for their votes? 'Where there is a gift of the same sum of money to a large number of persons after the election is over, the presumption will be that it was in consequence of an implied agreement or a corrupt expectation.' 6 Am. and Eng. Encyclopedia of Law, 366. This presumption would hold in this case, if there was no other evidence but that the voters cast their votes for Junction City and received the lots. In other words, under the evidence, if these parties had not denied that they were influenced by the gift of the lots, a jury would be justified in concluding that their votes were purchased, and, therefore, illegal. But there is other evidence. Each witness comes on the stand, and denies that he was influenced by the gift of the lots, and that he had intended to have voted for Junction City any way.

"The defendants contend that the complainants must show that the gift was the cause of changing their vote from the way they had intended to vote before it is bribery; and, in any case, their direct testimony that they were not influenced by the gift is conclusive as to the matter. What is 'bribery?' 'Bribery of a voter is the offering of a valuable consideration, either for his vote or for his forbearance to vote.' 3 Am. and Eng. Encyclopedia of Law, 533. 'It shall be unlawful   *   *   *   for any voter to take or receive

any bribe, compensation, money, article, or thing as an inducement to vote for any person or question.  * * *' Section 4, ch. 135, Laws, 1889. I have shown that the giving of these lots, without a doubt, comes under these definitions. The lots were valuable, they were given to voters, and were intended to influence their votes. I do not think that the complainants have to affirmatively show that it changed the direction of the voter's vote. In the absence of contradictory evidence, upon a showing that the offer was illegal, and the acceptance, the jury may well presume that the taking was illegal. If this is not so, then bribery can not be proven, unless it it first proven that the person charged has said that he was going to vote another way. But under the law of this territory it must be an inducement to vote. It need not be the only inducement, or the principal one. If it enters into his reason for so voting, and was given as an inducement, the taking is illegal. The intention of the law in condemning bribery, or undue influence, is to see that the judgment and decision of the voter is absolutely unbiased by any illegal offers up to the moment of, voting. Junction City and Aztec were entitled to have the unbiased judgment of the voter, uninfluenced by illegal considerations, up to the moment of voting. It may have been that all of these parties who took lots intended at first to vote for Junction City; but Aztec had the right to endeavor to change their decision by lawful arguments up to the time they deposited their votes. Now, if any party illegally offered them some inducement to vote for Junction City, which might operate to make the decision irrevocable, or make it harder for Aztec by lawful arguments to change that decision, and the parties took the unlawful inducement, then it is clear to me that their votes were illegal. In other words, that the law is not punishing for taking a bribe only when the direction of a vote is

changed, but for taking that which is intended as a bribe, and forestalls an unbiased judgment.

"But they all testify that the taking of lots was not an inducement, and that they were in no way influenced by it. I can not admit for a moment that this testimony is conclusive. To do so would be to say to every voter in this district: 'The law holds that though you receive money, lands, or goods without an equivalent from those who desire your vote, and it is proven that the giver presented them with an unlawful purpose, and you voted as the person giving you the money desired, yet you can free yourself by simply swearing that you were not influenced thereby.' This would be a dangerous holding. He who would take the goods would not hesitate to swear that he was not influenced thereby. I do not for a moment hold that their evidence is repudiated as worthless, only that it is not conclusive. But from the testimony I am convinced that they all must have known the purpose for which they were presented with the lots; that it, without a doubt, had its influence as an inducement in their voting for Junction City. At least, that the preponderance of testimony is in favor of the view that the taking of them was legally wrong under our statute, and that they should not be counted.

"I will now give attention to the case made by the defendants against the vote cast for Aztec. As I have already discussed the rules of evidence BARGAIN for votes. which I consider as binding, it will not require a very extended consideration of the evidence. The defendants contend that all the votes cast by members of the Largo Town Company for Aztec should be rejected as illegal, for the reason that they were purchased votes. The evidence substantially shows the following facts. That a place known as 'Largo' was at first intending to go into the contest for the county seat; that a number of its citizens asso-

ciated themselves together for the purpose of advancing its interests; that this association was neither a copartnership nor a corporation, but simply a voluntary association; that it could neither keep the people of Largo from voting for their town, nor against it; that it could not in any way, but by persuasion, control the votes of the members so associated together; that the character of the association was such that it had no legal right to bind its members by the agency of any one or more; that before the election a committee from the Largo association met a committee of the Aztec Town Company or association, and submitted certain propositions to each other looking to the withdrawal of one of the places from the contest; the majority of the Largo representatives accepted the Aztec proposition; that proposition was to give the Largo association half the town lots in Aztec, a certain portion of a forty-acre lot, and pay them for a certain piece of land which they had purchased for county purposes in Largo, the consideration for this concession being that Largo was to withdraw from the contest. There in some testimony, not very positive, that the Largo people were to work for Aztec. I am of the opinion that the necessary inference from the bargain is that they were so to work and vote. There was to be no consideration of the trade unless Aztec was made the county seat. Unlike the giving of the lots or certificates, therefore, by the Junction City people, this was simply a promise, and, while I do not hesitate to say that it was an illegal promise,—a bribe, under our statute,—yet there must be proof that this bribe or offer was accepted by those who voted for Aztec before their votes can be declared illegal. If Aztec had been declared the county seat, and a certain number of men from Largo had received lots in Aztec, or they had formed a legal organization and accepted the lots and land and money, and they

had voted for Aztec, it would have been sufficient proof of a corrupt agreement to nullify their votes. But no one has received anything; the association was in no sense a legal organization, the acts of whose representatives could bind anyone but themselves, unless there was proof positive that the voter presumed to have been represented is proved to have directly authorized someone to act for him. There is no such proof. There is proof as to the members of the Largo association. The complainants admit that nine of the members voted for Aztec. Of those nine, four were at the joint meeting when the agreement was made with Aztec. There is no evidence that the other five were present, and authorized the committee to make the agreement, nor is there any evidence that they agreed to partake of any benefit from the Aztec proposition except the fact of voting. That is not sufficient. But as to the four who made the agreement, I am satisfied that they must be considered as voting for Aztec for the inducement held out by that place, and their votes declared illegal. The names of these voters are Simon Martinez, Enrique Manzanares, Crisostomo Dominguez, and Juan N. Jaquez.

"It would seem that the Aztec people were as vigorous in canvassing for their town as were they of Junction City, and used the same kind of arguments. They issued lots for the nominal consideration of one dollar. One Crouch testifies that he voted for Aztec, and received a lot the day before election as a gift. This vote should be counted off. One Charles Tinkerson had a lot given him after election, but promised him before that time by Mr. Koontz. While the testimony might make of this an innocent transaction, yet I can not, in view of the whole testimony, disabuse my mind of the conviction that it was given and received as an inducement for the vote, and is therefore illegal.

"It is alleged that A. B. Stacey, John S. Stacey, R. L. Dennison, George J. Smith, and C. B. Smith voted for Aztec, and at the time were not residents of the territory, or citizens (as to Smith).

QUALIFICATION of voters: residence.

Under our law, a person must be a resident of the territory, county, and precinct for a certain time 'immediately preceding the election.' Now, the fact is that four of these persons were not, and if that statute (section 1214, Comp. Laws, 1884) means that, if a person is not in the territory, county, or precinct for all the days specified immediately preceding the election, his vote is illegal, then they should not be counted. But to hold that—to place such a construction on the statute—would outrage common sense. The people of San Juan county have their market for their produce in Durango, Colorado. It generally takes the farmers two or three days to go and return from this market. If, now, I should hold this statute to mean what it specifically states, a voter could not leave his precinct for a day to market his produce at any time within thirty days previous to the election without forfeiting his right to vote. These limits are simply limits to fix a bona fide residence. Now, residence is a fact depending upon outward acts and intention upon the part of the voter. McCrary, Elec., sec. 62.

"Now, from the voting, all of these parties above named are presumed to have been legal voters, and the testimony shows that they all had a residence where they voted sometime previous to their voting. Their voting is a fact going to show what their intention is as to their residence. It is incumbent upon the defendants to overcome the presumption in their favor, and by a preponderance of the legal testimony show that at the time the parties voted they were not residents of the places where they voted. The law certainly is that a voter may have a residence in one place and business in another, and

that he should vote at his residence. This applies to those especially who are not in a fixed business, such as cowboys. And, when once a residence is established, it is presumed to remain until proven to have been changed; and he who attacks the vote must prove the change. Now, in the case of Dennison, it is fully proven that he had a residence at Knickerbocker's, where he voted, and that he was a cowboy. The evidence to overcome this is simply his being out of the territory with a camping outfit. There is nothing tending to show where he had acquired another residence. If this man's vote was illegal, then that of R. G. Norris, upon his own showing, was equally so, and should be deducted from Junction City's vote. I do not believe that either is illegal. John S. Stacey was a resident of San Juan county. He went to Colorado to work for the alliance of San Juan county. He voted at Aztec, which shows his intention. There is nothing in his occupation which overcomes this intention. But, admitting that he was not a resident, the only proof that he voted for Aztec is that of someone whom he told. This I have held is incompetent. It is true that it is proven that all the votes but one cast at Aztec precinct were for Aztec, but as there is no proof who cast the one vote for Junction City, I can not say that this voter did not. A. B. Stacey was a married man. He removed his family to Colorado, where he rented a farm and cultivated it. It seems to me that he shows here his intention to change his residence. It is true there is no direct testimony as to which place he voted for, but, if I presume that the other Stacey voted for Junction City, then it is clear that this one must have voted for Aztec. His vote was illegal. As to George J. Smith, it is sufficient to say that he must have voted for Aztec. It is proven aliunde. He himself stated to Mr. Spence that he was a foreigner, and that he

QUALIFICATION of voters: change of residence.

never had his second papers. This testimony is admissible after the proof of the voting and for which place. His vote was illegal. As to C. B. Sharp, I am convinced by the testimony that his vote was illegal. The testimony to that effect was not contradicted. That he voted for Aztec is inevitable, under the testimony.

"These are all the illegal votes which I have been able to say have been proven upon either side by the legal testimony before me. There has been much testimony from witnesses that persons have told them that they had voted for such a place, and that they voted for money or lots. There was testimony showing that some voters voted for Junction City, they themselves swearing that they had, and that they had received lots. But there was other evidence showing that their interests were all in that neighborhood, and that they were working for that point as its active partisans; and it may well be that the lots were given them for their services in working for the place, as there seems to be no reason for bidding for their votes. While there was an activity on both sides in favor of the respective places, which resulted in making illegal offers in holding out illegal inducements, I have failed to find any such widespread acceptance of bribery among the voters at any polling precinct as requires me to hold that the election was in toto illegal.

"I find the following facts: (1) That upon November 4, 1890, there was an election held in San Juan county, New Mexico, for the location of a county seat. (2) That said election was held in accordance with chapter 7, Laws, 1889. (3) That, at said election, there was cast five hundred and two votes, of which Junction City received two hundred and fifty-five Aztec two hundred and forty-six votes, Farmington, one vote. (4) That the board of county canvassers declared Junction City chosen as the county seat by a

majority of nine votes over its nearest competitor, Aztec. (5) That from the two hundred and fifty-five votes cast for Junction City there should be deducted, as illegal, twenty-three votes; leaving, as legal votes cast in favor of Junction City, two hundred and thirty-two. (6) That from the two hundred and forty-six votes cast for Aztec there should be deducted, as illegal votes, nine votes; leaving, as legal votes cast in favor of Aztec, two hundred and thirty-seven. (7) That of the legal votes cast, the place known as 'Aztec' received a majority of five votes over Junction City.

"As a legal conclusion, I find that the place known as 'Aztec' having received a majority of five votes over its next nearest competitor, is the legally elected county seat of San Juan county. As both parties, as shown by the testimony, were using means to gain their ends, which were not legal, the costs will be divided as in the decree set out. Judgment will be given for the complainants."

### OPINION OF THE COURT.

FREEMAN, J.—There is no error in this record, and the decree will be affirmed. The facts are as follows: On November 4, 1890, there was an election held in San Juan county, for the purpose of locating a county site. The principal competitors were Aztec and Junction City. The friends of both places resorted to every possible means to procure votes for their respective choice. The district judge, sitting as a chancellor, found that persons had been allowed to vote who were not legally qualified, and also that a large number had been induced to vote in the one way or the other by presents in the shape of town lots. The number of persons so induced to vote, and the means by which the improper influences were brought to bear, as set

out in detail in a very carefully prepared opinion of the trial judge, whose findings of fact, and whose application of the law thereto, are, in our opinion, in the main correct, and are here given in the language of the judge.

O'BRIEN, C. J., and LEE and McFIE, JJ., concur.