149 P.2d 1003

CHASE, Attorney General, v. LUJAN,
County Clerk, et al.

No. 4833.

Supreme Court of New Mexico.

March 24, 1944.

Rehearing Denied July 7, 1944.

Edward P. Chase, Atty. Gen., C. C. Mc-Culloh, 1st Asst. Atty. Gen., and Harry L. Bigbee and Robert W. Ward, Asst. Attys. Gen., for appellant.

David W. Carmody, Dist. Atty., and Reed Holloman, both of Santa Fe, for appellees.

BRICE, Justice.

We are asked to determine whether the cases of Thompson v. Scheier, 40 N.M. 199, 57 P.2d 293, and Baca v. Ortiz, 40 N.M. 435, 61 P.2d 320, should be overruled to the extent each holds that the Const., Art. 7, § 1, requires the personal presence at the polls of an otherwise qualified elector when he offers to vote.

The question is presented in a suit for a declaratory judgment filed by the Attorney General in the District Court of Santa Fe County, suing on behalf of the registered and qualified voters of said county who are absent from the state in the military or naval service of the United States and desirous of voting in the ensuing general election. The County Commissioners and County Clerk are made defendants and it is alleged they will refuse to carry out the provisions of 1929 Comp., §§ 41-333 and 41-336, L. 1927, c. 41, known as an absentee voting law, to the loss of their right to vote by those for whom plaintiff sues and others similarly situated, unless the court declare same constitutional. This is the first cause of action set up in the complaint. For a second cause of action and as a corollary to the first, it is alleged a like result will follow unless the court declare validly adopted a proposed amendment of Art. 7, § 1, of the constitution submitted in 1920, authorizing the legislature to enact laws governing voting by citizens absent in the military or naval service of the state or nation.

The defendants moved to dismiss the complaint upon the ground that both questions alleged to be controversial between the parties already had been before the Supreme Court of this state and each decided contrary to the contention of the plaintiff. The trial court after hearing arguments sustained the motion and dismissed the complaint. This appeal followed.

Although the defendants both answered and moved to dismiss, in neither pleading did they suggest a want of jurisdiction in the district court to entertain the proceeding as a suit for a declaratory judgment, either for want of a proper party plaintiff or for lack of an actual controversy. Nevertheless, the trial judge expressed grave doubt whether an actual controversy existed but in order to facilitate the determination of a matter of great

public importance entertained jurisdiction with the result already stated. We share the doubts of the learned trial judge, especially on the right of the Attorney General to appear as a party plaintiff. In view of the great public interest in the question raised, not only in New Mexico but throughout the nation, we shall not scrutinize too closely the plaintiff's capacity to sue. Cf. State ex rel. Capitol Addition Building Commission v. Connelly, 39 N.M. 312, 46 P.2d 1097. Nevertheless, we shall not deem the fact that jurisdiction is entertained in this case as a precedent for settling future narrow cases of jurisdiction under the declaratory judgments act. We approach the matter here in somewhat the same spirit as did the Supreme Court of New Jersey in Re Freeholders of Hudson County, 105 N.J.L. 57, 143 A. 536, 537, from whose opinion we quote approvingly, as follows:

"In view of the fact that the public is vitally interested and affected by the statute and an election is near at hand, an urgency has arisen for a speedy pronouncement by this court as to the validity of the act, and as counsel of the respective parties have been heard upon the merits of the case and submitted the same to the court, sitting in banc, for determination, we have suspended consideration of the question as to the legal propriety of the procedural form in which the matter is presented."

The question presented when viewed in the light of the two decisions first above mentioned reduces itself within a very narrow compass. Art. 7, § 1, of our constitution, dealing with the elective franchise, among other things, provides:

" § 1. Every male citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he *offers to vote* thirty days, next preceding the election * * * shall be qualified to vote at all elections for public officers. * * *

"The legislature shall have the power to require the registration of the qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration and not more than two judges of election shall belong to the same political party at the time of their appointment." (Emphasis ours.)

When our constitution was adopted there was in force in New Mexico a territorial law of long standing requiring the personal presence of the voter at the polls and the manual delivery of his ballot to the election officials, reading as follows:

"All votes shall be by ballot, each voter being required to deliver his own vote in person." L. 1851, p. 196, Code 1915, § 1999.

Other territorial statutes then in effect and employing the phrase "offer to vote"

or other language of similar import (italicised by us in the quotations) are as follows:

"When any person *offers to vote,* whose qualifications are not personally known to any of the judges, he may be examined under oath as to said qualifications and those who take a false oath shall suffer the penalty prescribed by law for perjury." L. 1851, p. 196, Code 1915, § 2006.

"Every person who is not a native citizen of the United States, or adopted citizen of this State, who may *present himself to vote* at any election in this State, shall be examined by the judges of election, in whose precinct he may apply to vote, and proving to the satisfaction of the said judges that he has legal letters of naturalization or of citizenship, he shall be allowed to vote; but should there still exist doubts of his right to vote, they shall act in accordance with the provisions of section 2018." L. 1854-55, p. 142, Code 1915, § 2017.

"That it shall hereafter be unlawful for any person who is not a qualified elector, to vote, or to *offer to vote* at any election held in this State, or to register or offer to register as a voter; and it shall be unlawful for any persons to register or offer to register, or to vote or *offer to vote* in the name of another person; * * *." Code 1915, § 2055.

"If any person is refused registration by the judges of registration, he may make and present to the judges, his affidavit in writing, setting forth that the affiant is a citizen of the United States, that he has resided in the State of New Mexico for the twelve months next preceding, in the county for ninety days next preceding, and in the precinct in which he *offers to register,* for thirty days next preceding the next ensuing election, and that he is not disqualified for any reason from being registered as a voter and from voting at said election; * * *." 1915 Code, § 1964, L. 1889, c. 135, § 12.

What we were called upon in the two cases mentioned to decide and what we now are asked to re-examine for the purpose of ascertaining whether we correctly decided it, is this: When the phrase "offers to vote" is employed in the portion of Constitution Art. 7, § 1, quoted hereinabove, is the personal presence of the voter contemplated in making the offer? We so held in Thompson v. Scheier and Baca v. Ortiz. The matter was thoroughly considered when it first was before us in the Thompson case and the conclusion announced in a unanimous opinion was deliberately reached. Within six months the question again was presented in the Baca case, re-examined and the decision reached in the former case adhered to in another unanimous opinion. Were we right in so holding? That is the single question asked of us to which after further painstaking consideration we feel compelled to give an affirmative answer.

It will be seen from an examination of the foregoing statutes that in at least four

separate instances our territorial legislature had employed the phrase "offer to vote" or its equivalent in a sense unmistakably indicating and meaning a "personal" offer to vote or register, a conclusion rendered certain by the mandatory statutory requirement that each voter shall "be required to deliver his own vote in person." Code 1915, § 1999. Significantly, too, the language chosen by the framers of our constitution for stating the qualifications of a voter finds its nearest counterpart in L. 1889, c. 135, § 12, Code 1915, § 1964, setting forth the qualifications upon registering to vote. In order to indicate the similarity in the language chosen, we set forth the same in parallel columns as follows:

The foregoing territorial laws furnished the historical background in the use of the phrase "offer to vote" in our constitution at the time we considered what was meant by the phrase in Thompson v. Scheier. Naturally, we turned our attention to the construction given those words in other constitutions at the time we used them in our own. Upon doing so, we found that insofar as such language had been construed at all by the courts of sister states, it invariably had been held to require a personal appearance of the voter and the manual delivery of his ballot to the election officials. See Chase v. Miller, 41 Pa. 403, and People v. Blodgett, 13 Mich. 127. Relative to the state of the law on this point,

"§ 1. Every male citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he *offers to vote* thirty days, next preceding the election * * * shall be qualified to vote at all elections for public officers * * *." (Emphasis ours.)

"If any person is refused registration by the judges of registration, he may make and present to the judges, his affidavit in writing, setting forth that the affiant is a citizen of the United States, that he has resided in the State of New Mexico for the twelve months next preceding, in the county for ninety days next preceding, and in the precinct in which he *offers to register,* for thirty days next preceding the next ensuing election, and that he is not disqualified for any reason from being registered as a voter and from voting at said election; * * *." (Emphasis ours.)

we stated in Thompson v. Scheier [40 N.M. 199, 57 P.2d 304] the following, to-wit:

"The Constitutional Convention adopted a provision, the language of which had been construed by some of the ablest courts of America, and its terms were invariably held to require the voter to personally deliver his ballot at the precinct polls of his residence; and only since the adoption of the New Mexico Constitution has any court decided differently. Jenkins v. State Board of Elections, 180 N.C. 169, 104 S.E. 346, 14 A.L.R. 1247; Jones v. Smith, 165 Ark. 425, 264 S.W. 950; Straughan v. Meyers, 268 Mo. 580, 187 S.W. 1159. The statutes of New Mexico had for 60 years so provided; * * *."

When our territorial legislature in 1851 enacted the express statutory requirement that the voter must be present in person and make manual delivery of his ballot to the election officials, it was merely giving expression to the rule of the common law on the subject. 29 C.J.S., Elections, p. 297, § 210; State v. Rinehart, 140 Fla. 645, 192 So. 819; People v. Blodgett (opinion of Christiancy), supra; and In re Opinion of the Justices, 80 N.H. 595, 113 A. 293. In 3 Sutherland Statutory Construction, 3d Ed., p. 9, § 5303, appears a discussion of the subject "Words and Phrases Having a Well Defined Common Law Meaning." The author states: "Words and phrases having a well defined meaning in the common law are to be interpreted in the same sense under the statute when used in connection with the same or similar subject matter with which they are associated at common law." The author appends a number of illustrations and citations under Note No. 1 supporting this statement. Among them is Territory v. Cutinola, 1887, 4 N.M. 305, 14 P. 809, 810. In that case our Territorial Supreme Court was considering what a New Mexico statute meant by the use of the word "information". It said:

"The statute does not undertake to define an information, or prescribe its form or contents. We must therefore look to the common law to ascertain what it is and what its requisites, in the particular question, are."

In 59 C.J., Statutes, p. 1041, § 619, in discussing construction with reference to other statutes, the author states: "The meaning of doubtful words in one statute may be determined by reference to another in which the same words have been used in a more obvious sense."

Somewhat this same thought is expressed in People v. Blodgett, supra, where the term "legislature" as used in a constitutional provision was held to mean the legislature eo nomine as known in the political history of the country.

Thus confronted in Thompson v. Scheier with the employment in the constitution of a phrase having a well defined and generally understood meaning in New Mexico for nearly sixty years and met with a construction as of that date by the highest courts of sister states which conformed to that definition, and supported as well by a

common law rule based on immemorial usage which would give to the phrase "offer to vote" the meaning of personal presence in connection with the offer, we held that when the framers of the constitution used it and when the people adopted it, the words carried the only meaning with which the framers and the people were familiar and had been familiar for more than half a century. In other words, we held that when the framers of the constitution, possessed as they were with a knowledge of what the words "offer to vote" meant, appropriated the phrase from the territorial laws and employed it in the same connection in the constitution, they transplanted the meaning as well as the words and wrote that meaning into the constitution. Such were the views entertained by us when the Thompson and Baca cases were decided. We are not persuaded that such views misinterpret the true intent of the questioned language as used in our constitution.

We are not unmindful that New Mexico constitutes one of a very small minority among the sisterhood of states in which absentee voting is not authorized under constitutional provisions. We may assume the correctness of the Attorney General's appraisal that, from the standpoint of numerical superiority, the weight of authority since the adoption of our constitution supports a different construction of the language involved from that which we have given it. But, as said in Thompson v. Scheier, at the time we adopted our constitution, the only courts that had been called upon to construe the identical language, Michigan in People v. Blodgett, supra, and Pennsylvania in Chase v. Miller, supra, had given it the same meaning we gave it and that no court had construed it differently. That statement was made deliberately and it still holds good.

Any suggestion that the so-called Civil War cases sustaining absentee voting under their respective constitutions had construed identical or even substantially the same language differently simply results from a total misapprehension of the language of those opinions and the constitutional provisions involved. The opinions referred to are Morrison v. Springer, 15 Iowa 304; Lehman v. McBride, 15 Ohio St. 573; State ex rel. Chandler v. Main, 16 Wis. 398, 422. The Wisconsin court in the Chandler case agrees, at least inferentially, that Chase v. Miller was correct in holding that the phrase "offers to vote" in the Pennsylvania constitution requires the personal presence and manual delivery of his ballot by the voter, but states the two provisions of the respective constitutions are totally different. The Ohio court in the Lehman case commented on the decision in Chase v. Miller and on the language "offers to vote" being construed, and concluded that "the absence of any such clause in our state constitution, renders this decision inapplicable in the case before us." The Iowa court in the Morrison case was construing the phrase in their constitution, "in which he claims his vote." In reaching the result it did, it differentiated between

the meaning of the phrase "to claim" and "to offer."

It thus will be seen that these three courts themselves made no claim that the Pennsylvania court had erred. In fact, at least two of them approved its decision and the other, the Iowa court, does not criticize it. It merely shows that its constitution was different from that of Pennsylvania and that there was a difference in meaning between the phrases "claims his vote" and "offers to vote".

Repeatedly, do the minority remind us that the so-called Civil War cases, whose construction we adopted, *are eighty years old*! What of it, if they rest on sound reason? Since when have truth and reason depreciated with age? It will not do, in effect, to call these cases "old fashioned" and out of step with a small numerical superiority in number of cases since decided, unless the reasoning of the older cases can be successfully challenged. This has not been done in any of the later decisions, nor in any one of them is there raised a single argument in support of the results they announce that was not put forward in either People v. Blodgett, supra; Chase v. Miller, supra; or Bourland v. Hildreth, 26 Cal. 161, carefully considered and fully answered. These cases were decided by great courts with personnel of eminent judges and exhaustive opinions were written which reflect profound consideration of every question decided. No case since decided has even approached these earlier decisions in either the deep understanding displayed of the questions decided or the logic with which such questions were resolved. Nevertheless, they merely justify as precedents the correctness of a conclusion which seemed obvious when we came to find meaning for the words "offers to vote" in the light of their historical background. Our faith in the correctness of these older precedents remains unshaken.

At the time our opinion in Thompson v. Scheier was written (May 1936), the Supreme Court of Pennsylvania (1924) in Re Contested Election in Fifth Ward, 281 Pa. 131, 126 A. 199, 35 A.L.R. 815, following Chase v. Miller, supra, had given the questioned language the same construction we gave it. The following cases had decided the question contrary to our decision: Straughan v. Meyers, 268 Mo. 580, 187 S. W. 1159, decided in 1916; Jenkins v. State Board of Elections, 180 N.C. 169, 104 S.E. 346, 14 A.L.R. 1247, decided in 1920; Goodell v. Judith Basin County, 70 Mont. 222, 224 P. 1110, decided in 1924; Jones v. Smith, 165 Ark. 425, 264 S.W. 950, decided in 1924; Moore v. Pullem, 150 Va. 174, 142 S.E. 415, decided in 1928; and Bullington v. Grabow, 88 Colo. 561, 298 P. 1059, decided in 1931. The only case decided adversely since Thompson v. Scheier is Lemons v. Noller, 144 Kan. 813, 63 P.2d 177, decided in December, 1936. A full and rather complete annotation on the subject will be found in 14 A.L.R. 1256, supplemented as follows: 19 A.L.R. 308; 35 A.L.R. 819; 121 A.L.R. 989; 132 A.L.R. 374; 140 A. L.R. 1100; and 147 A.L.R. 1443.

We had before us and considered in our opinion all of the prior decisions listed hereinabove except Moore v. Pullem and Bullington v. Grabow, which either were not called to our attention or escaped notice in the preparation of our opinion. We gave due consideration to the arguments advanced in these cases at the time the Thompson case was decided. We were not unaware of the fact that they had decided differently the very same question before us, some of them taking into account other constitutional provisions not present in our own. We simply felt, and still feel, that with the historical background presented by the questioned language found in our constitution, the result we announced was the better supported in reason and logic and the more nearly approximates the intent of the framers of our constitution. We have had no decision called to our attention holding adversely to our conclusion where the court had under consideration a historical background of such richness and strength on the meaning of the questioned language as a basis for its decision.

Much is said arguendo on the views entertained about the question here presented by eminent members of Congress when that body was considering our proposed constitution. Nothing has been brought to our attention even mildly suggesting that the Congress gave this subject the slightest thought. In any event, time is more properly and profitably spent in ascertaining the intent of our own people in adopting, and of the framers in submitting, this provision of the constitution—not what the senator from New Jersey or the gentleman from New York may have thought about it, if he thought about it at all.

Nor does it furnish aid in arriving at the true meaning of this language to be reminded that New Mexico is one of a very small minority of the states of the union denying the privilege of absentee voting. It would serve no useful purpose and would unduly extend the length of this opinion to conduct a roll-call of the states, cataloguing their pertinent constitutional provisions, and classifying them as to time and manner of acquiring the privilege. It is enough to say that some have the right by virtue of constitutional provisions or subsequent amendments; others (constituting a small minority of the states enjoying the right) by virtue of court decisions upholding absentee voting under constitutions similar to our own in this respect; and still others by virtue of statutes conferring the right in states having constitutional provisions similar to our own but in which the validity of the statutes has never been challenged on constitutional grounds. Indeed, New Mexico was in the latter class of states from the time L.1927, c. 41, 1929 Comp., §§ 41-333 and 41-336, was enacted until the election contest involved in Thompson v. Scheier was initiated. Notice was taken of these considerations by the Supreme Court of Pennsylvania in Re Contested Election in Fifth Ward, 281 Pa. 131, 126 A. 199, 200, 35 A.L.R. 815, where it is said:

"More than 30 of the states of the Union now have absentee voting laws of similar

character, usually limited in the grant of privilege to those in military service, *and in most cases authorized by special constitutional provision.*" (Emphasis ours.)

█ It is strongly urged upon us that the express delegation of authority to the legislature in the second paragraph of Art. 7, § 1, to "regulate the manner, time and places of voting," gives it into the hands of the legislature to permit absentee voting whenever it so elects. This argument proceeds on the assumption that, voting either personally or as an absentee, relates only to the manner of voting and thus is carried outside the bounds of constitutional inhibitions. It is interesting to note that in each of the three respects in which the legislature is thus authorized to regulate, to-wit, the manner, the time and the place of voting, conditions will be found concerning the same which the legislature is powerless to avoid. For instance, Art. 20, § 6, fixes the time of holding general elections as the first Tuesday after the first Monday in each even numbered year. The legislature could not change that. The very Art. 7 with which we are concerned in § 1 thereof inescapably fixes the place of election as the precinct of the voter's residence. The legislature is powerless to change that. Section 5 of the same Art. 7 prescribes the manner of voting in one respect shall be by ballot. The legislature could not change that. Likewise, as we held in Thompson v. Scheier as a matter of true intent, the first paragraph of § 1 of Art. 7 contemplates that only those can vote at elections who are otherwise qualified electors and are personally present in the precinct of their residence offering to vote in person. The legislature cannot change that.

Aside from the fact that, except as prohibited, the legislature has plenary power to regulate the manner of voting (State v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878), the circumstance that confirmation of this legislative power appears in § 1 of Art. 7 after the framers in the first paragraph had finished describing the attributes of those who are entitled to vote, strongly indicates all this language means is that the legislature shall regulate the method and mechanics of voting by those who are otherwise qualified electors offering to vote in person. See In re Opinion of the Justices, 67 R.I. 465, 25 A.2d 360, 140 A.L.R. 1096. And see, also, In Re Contested Election in Fifth Ward, supra, where the Pennsylvania Supreme Court said that the power of the legislature to make regulations as to the place, mode and manner of voting to insure the full and free exercise of the right to vote is subordinate to the right itself, and further said: "The right must not be impaired by the regulation. It must be regulation purely, not destruction. If this were not an immutable principle, elements essential to the right itself might be invaded, frittered away, or entirely exscinded under the name or pretense of regulation, and thus would the natural order of things be subverted by making the principle subordinate to the accessory." We think upon the same reasoning that the leg-

islature could not, by virtue of the clause involved, enlarge the right to vote beyond that delineated in the first paragraph of § 1 of Art. 7.

Caution should be exercised not to confuse the phrase "qualified elector" as popularly understood, with the phrase "qualified to vote" or "entitled to vote." For instance, § 2 of Art. 7 says that every citizen of the United States who is a legal resident of the state and is a qualified elector therein shall be qualified to hold any public office in the state except as otherwise provided in the constitution. Manifestly, "qualified elector" as there employed, is not dependent upon whether the elector has exercised the right of elective franchise or not. Looking at the matter realistically, however, one may have all of the other qualifications of an elector and yet if he does not appear in person in the precinct of his residence on election day and offer to vote, he has failed to fulfill one of the conditions necessary to entitle him to vote.

The argument based on the provision: "The legislature * * * shall regulate the manner, time and places of voting," would be equally potent to sanction legislative authorization of voting otherwise than by ballot, otherwise than on the Tuesday after the first Monday in November in each even numbered year. and otherwise than in the precinct of the elector's residence.

It makes no difference whether the conditions which must converge to the point of permitting a vote to be cast be called a power, qualification, authority, capability, essential, competency or requisite, they, nor the convergence of all of them in order to allow the citizen to vote, may neither be enlarged, diminished or dispensed with under the pretext of legislative regulation.

In order to vote a person must possess certain qualifications and he must do certain things. Elections are determined by those who vote, not by those merely potentially qualified to vote. Davy v. McNeill, 31 N.M. 7, 240 P. 482; Fabro v. Town of Gallup, 15 N.M. 108, 103 P. 271, 273. In White v. Commissioners of Multnomah County, 13 Or. 317, 10 P. 484, 486, 57 Am. Rep. 20, it was said:

" 'Every definition of the qualification of voters,' said Mr. Drake, the author of the Law of Attachment, arguing in Blair v. Ridgely, 41 Mo. 63 [97 Am.Dec. 248], 'is but a statement of the terms on which men may vote; and in every instance such definitions refer to what a party has done as well as to what he is. They say to the voter: "If you have done certain things you can vote." ' He who does not register is not qualified to vote, and hence is not a 'qualified elector,'— a phrase that is used five times in the constitution to signify those who are entitled to go to the polls on election day and legally vote. See Byrne v. State, 12 Wis. 519, 524; Sanford v. Prentice, 28 Wis. [358], 363. But under this act he who goes to the polls on election day, possessing every constitutional qualification, may find that the legislature has stepped in between him and the constitution. He finds his vote de-

nied because he has not done something which the legislature has required him to do. He discovers that he is not a qualified elector, and yet he is told that his omission to do the act which had effect to disqualify him is not itself a disqualification; or if he have performed the act, that his performance does not constitute a qualification. This will not square with the logic of facts. The distinction between what is substantive and what is modal is confounded. He who has a right to something to-morrow can never be secure of his right before to-morrow comes."

We think Joint Resolution 12 of the 1919 Legislature, Laws 1919, p. 370, which provided for an amendment to the Constitution of New Mexico by adding another section to Art. VII, the same to be numbered Sec. 6, clearly and succinctly states the situation. It declared:

"Citizens of the state, absent from their places of legal residence, in the military or naval service of the United States or of this state, and being otherwise qualified electors, may be allowed to vote at any election for all state officers, presidential electors, Representatives in Congress, and upon Constitutional amendments, under such regulations and limitations as may be prescribed by law."

The legislature had the right appraisal of § 1 of Art. 7, namely, qualified electors who are absent from the precinct in which they might, if present, offer to vote shall not be "allowed to vote." They proposed to eliminate this disqualifying obstacle and indi-cated quite clearly a common understanding that "otherwise qualified electors"— "absent from their places of legal residence" were not allowed to vote. Thus the conditions precedent which must exist in order to "allow" one otherwise qualified, to vote, were not left to the legislature to change or alter under the guise of a power to regulate manner of voting.

The confirmation of the plenary power of the legislature to regulate the manner of voting means only that the legislature may regulate the manner of voting of those who are "allowed to vote." See In re Opinion of the Justices (R.I.) supra [67 R.I. 465, 25 A.2d 363, 140 A.L.R. 1096], where the court said:

"The words, 'provide special regulations and manner of voting' in the last sentence of section 1 are not apt words to authorize the general assembly to confer upon the absent electors in the actual military service of the United States a greater franchise than that expressly conferred by the amendment upon all absent electors. On the contrary, upon first reading, such words seem to refer more naturally to the method or mechanics of exercising the limited franchise so conferred."

In Thompson v. Scheier we made mention of the fact that a limited absentee voting law applicable only in the county of the voter's residence had been enacted in 1869, L.1869, c. 49, § 1 (section 1709, C.L. 1897), which was probably repealed by § 12 of c. 135 of New Mexico Session Laws of 1889 (section 1702, C.L. 1897). As a mat-

ter of fact, this same law in substance had been earlier enacted as § 18 of L. 1851–52, p. 196, C.L. 1897, § 1646. Incidentally, it furnishes another instance, in addition to those listed earlier in this opinion, in which the members of our territorial legislature employed the phrase "offers to vote" in the same sense in which the delegates to our Constitutional Convention used it when they transplanted it into this part of our constitution, as we held in Thompson v. Scheier. The 1851 law provided:

"Each voter shall vote in the county and precinct wherein he resides, but if any person should *offer to vote* in a precinct wherein he does not reside and have the necessary qualification, he may vote on taking an oath that he has not voted nor will not vote at any other precinct during the present election." (Emphasis ours.)

It is significant that while this statute and the later 1869 statute waived voting in the elector's home precinct, they did not waive a personal appearance in whatever other precinct within the county he might offer to vote. The authorization to vote outside the precinct of his residence in the same county was abrogated by the adoption of the constitution which requires voting in an elector's home precinct. The requirement for personal appearance of the voter in making his offer to vote was never abrogated by territorial laws and, as we have held, was continued by the constitution.

There is another consideration which lends support to the conclusion that we correctly interpreted the questioned constitutional provision in our earlier decisions. The constitution makers were not unfamiliar with the controversial question as to absentee voting. They were familiar with the common law understanding that an offer to vote contemplated a personal appearance of the voter in connection with such offer. They knew of the mandatory requirement for voting in that manner which had been in force in New Mexico for approximately sixty years. They were familiar with the meaning which attended the phrase "offers to vote" in several separate sections of the territorial laws and employed the phrase in the face of such knowledge in this provision of our constitution without in any way qualifying that meaning. These considerations impress us that if it had been the desire of the convention to authorize absentee voting, it would have been an easy and simple manner to choose language making clear the intention to do so.

. It should be mentioned that three separate sessions of the legislature, to-wit, 1919, already noticed, 1937 and 1939, by submitting proposed constitutional amendments authorizing the legislature to enact absentee voting laws, interpreted the constitution as requiring the authorization to support such legislation. On the other hand, the 1927 and 1933 sessions, by enacting or amending an absentee voter's law, gave a contrary legislative interpretation. All proposals to amend have failed of adoption.

In his argument before us, both orally and in his briefs, the Attorney General has repeatedly reminded us that our decision in Thompson v. Scheier on the point here involved was unnecessary to a decision and therefore should not be given the customary weight as stare decisis. Similar argument is directed at the decisions in People v. Blodgett and Chase v. Miller, supra, seeking thus to weaken the force of those decisions and our own in the Thompson case so far as a decision of the question here presented is concerned. The argument is faulty and fails to impress us as sound. While it is true we might have decided Thompson v. Scheier without determining this point, the question was presented and argued as one of the grounds of unconstitutionality inhering in the absentee voter's law. The fact that a court of competent jurisdiction may declare a statute unconstitutional on two grounds, whereas it might have rested its decision on one ground only, does not make the decision on the second ground dictum. Duncan v. Brown, 18 N.M. 579, 139 P. 140; Baca v. Chavez, 32 N.M. 210, 252 P. 987. And, under well settled principles, we should not depart from these two former decisions, each by a unanimous court, unless with the fullest conviction that the law has been settled wrongly. 21 C.J.S., "Courts", p. 324, § 193, State v. Cox, 43 Ariz. 174, 30 P.2d 825. We entertain no such conviction but, on the contrary, after a painstaking re-examination of the question and the fullest consideration of the arguments presented by the Attorney General, we are reinforced in the belief that the question was correctly decided. This is so, notwithstanding any belief on the part of our dissenting brethren that but for the two former decisions, there would be unanimity of opinion amongst us on the correctness of the view supported by them. And, since opinions are being freely expressed, may we not properly give it as ours that any reconsideration of this question in normal times, with minds and emotions freed from the exigent influence of a global war and the hardships engendered by it, as was true when the Thompson and Baca cases were decided in 1936, would have left none in doubt that those cases would be adhered to by a unanimous court.

In closing this opinion, it may be proper to say that we regret the conditions which will deny to many thousands of our patriotic service men and women, serving at home and abroad but absent from their home precincts on the day of election, the privilege of exercising their voting franchise. Those conditions, however, are beyond our control as a court. They inhere in our fundamental law and can be changed only as therein provided. The difficulty of bringing about a change likewise is beyond our control.

The language of the Supreme Court of Rhode Island in Re Opinion of the Justices, supra (1942), in dealing with a somewhat similar question, reflects our own feelings as we have deliberated the decision in this case. There the court said:

"Under a liberal construction in favor of those citizens performing or called to perform the highest duty of a citizen in a free government, that of military service in its defense in time of war, it is arguable that the people intended that the legislature should be authorized to make special provisions in favor of such citizens, not only as to the exercise of the franchise, but also as to the extension of it. Such an argument in times like the present appeals strongly to the heart, and were we free to follow only our feelings in the matter, we would have no difficulty; but in this, as in all other questions pertaining to the scope and limitations of the constitution, we are bound by the well-established rules of construction of constitutions."

One of the principles of our democracy for which our armed forces fight is the separation of powers. We, too, champion the principle that amendments to constitutions must be left to the people and not supplied by the courts.

It follows from what has been said that both causes of action set up in the complaint must fail and that the judgment of the district court is correct and should be affirmed.

It is so ordered.

SADLER, C. J., and BICKLEY, J., concur.

MABRY, Justice (dissenting).

Mr. Justice THREET and I are unable to join in the majority opinion for the reasons hereinafter to be shown.

All rules of statutory construction, including those our own court has so often emphasized, we believe have been thrust aside in appraising the constitutional language "in which he offers to vote." The majority opinion concedes that the "great weight" of present authority is against its holding. We go further and say that not one case decided since the time of the Civil War period will support it. We call to our aid the supreme importance of the question and the minority's very grave and abiding doubt as to the correctness of the majority holding when we beg the patient indulgence of the bench and bar for such a lengthy dissent.

As Mr. Justice THREET and I view it, the prevailing opinion, in brief, achieves these unfortunate results: (1) This court becomes committed to an interpretation of the Constitution which will, perhaps, forever prohibit absentee voting in New Mexico as to any New Mexico officials; and likewise for members of the Congress regardless of any form of Federal ballot proposed. Since the language "in which he offers to vote" is, by the majority's interpretation, made a part of the right, the qualification, to vote, any effort to amend the article in which the language is found —the article on franchise—would be a useless gesture, as the legislature has, itself, doubtless felt. (2) It takes a position contrary to every interpretation, both legisla-

tive and judicial, of such language since the days of the Civil War, and charges to the Constitution makers, the Congress and the people of the territory in adopting the Constitution both lack of vision and self-deception. All but one other state now permit absentee voting, thirty-one of them with Constitutions employing, in this connection, the same language that we find in Sec. 1 of Art. 7 of the New Mexico Constitution.

We cannot escape the conclusion that it was the intention of the constitution makers in submitting this section, and of Congress in thereafter submitting and requiring of the people of the territory of New Mexico a vote upon the provision upon amendment as it applied to such section, hereinafter to be more fully discussed, to do no more than to definitely and unalterably fix qualifications of voters. *Manner* of voting, as this same section clearly enough shows, was to be left for the legislature to provide. The appraisal we here apply will appear more unquestionable, we believe, from what is to be hereinafter noticed, borrowing, as we shall, from the official committee report of the congressional Committee on Territories and the debates in Congress when the adoption or rejection of the Constitution which had been framed, submitted and approved by our people, was there for consideration.

It cannot be passed unnoticed that so many courts have now, subsequent to 1910, likewise construed provisions containing the words "in the precinct in which he offers to vote", as doing nothing more than

fixing qualifications, and as in no sense determining manner of voting; and that none (since 1865) are to be found to the contrary. And, moreover, none of these decisions, now to be referred to, in considering the applicable statutes could rely (as we can) for additional support for their holdings upon such constitutional provisions as are contained in the section of our Constitution in question—a provision which expressly shows a reservation by the people of the power to completely "regulate the manner, time and places of voting." See Jones v. Smith, 165 Ark. 425, 264 S.W. 950; Straughan v. Meyers, 268 Mo. 580, 187 S.W. 1159; Goodell v. Judith Basin County, 70 Mont. 222, 224 P. 1110; Jenkins v. State Board of Elections, 180 N. C. 169, 104 S.E. 346, 14 A.L.R. 1247; Moore et al. v. Pullem et al., 150 Va. 174, 142 S.E. 415; Bullington v. Grabow, 88 Colo. 561, 298 P. 1059; Lemons v. Noller, 144 Kan. 813, 63 P.2d 177.

Only in the seven cases last above cited, it seems, have the courts of this country, since the time of the Civil War, been called upon to determine the meaning of such phrase as "in which he offers to vote," as employed in our Constitution; and yet some thirty-one state Constitutions employ the term, and in all the states of the Union save one (although the Constitutions of the other sixteen employ different language) absentee voting has been permitted under legislation so authorizing. It seems that this constitutional language has troubled but few courts or that it has sufficiently intrigued litigants to cause to be raised

the question in but these seven cases through all the years. And, it is doubtful whether, had it not been for these poorly reasoned two or three cases of the Civil War period where such voting was denied, the question might never thereafter have been raised in any of the courts.

Therefore, at most, it must be said, that at the time of the Civil War, and until the American courts had come to deal more definitely and particularly with the question, they were substantially evenly divided upon matter. Since these early cases, and for over eighty years now, not one American court has appraised the language as the majority here appraise it (except Pa., to be distinguished, which considered its early holding controlling); and at least seven different state courts, passing directly upon the question, have held specifically that such language relates in no way to the *manner* or *method* of voting and does no more than fix the period of residence in the home precinct of the person proposing to vote. The word "manner" in this connection is synonymous with "method" and means, as Webster defines it: "Mode of action; way of performing or effecting; method." "The word 'manner' (employed in the Australian ballot law) has here the ordinary meaning of mode, method, way," etc. Getty v. Holcomb, 79 Kan. 224, 99 P. 218, 219.

We call special attention to Bullington v. Grabow (Colo.), and Jenkins v. State Board of Elections, etc. (N.C.), supra. To quote from language employed in the opinion of the North Carolina case [180 N.C. 169, 104 S.E. 350, 14 A.L.R. 1247]:

"This presumption of the constitutionality of this act cannot be overcome, in view of the fact that in 43 of the states out of the 48 there are statutes which in some form confer the right on absentees to vote. In our own state, and in probably all the states, north and south, such right was conferred upon our soldiers during the Civil War, and it is a historical fact that by virtue of the vote thus cast by the soldiers, Zebulon B. Vance was elected Governor of this state in 1862 and Abraham Lincoln was re-elected President in 1864. The method of absentee voting enacted at that time by this state, and by most others, authorized the soldiers to cast their ballots out of the state, in elections to be held by officials who may or may not have been citizens of the state, and without the safeguards of registration or challenge, and the votes were sent usually to some state officer for distribution to the various precincts where the voters were entitled to vote. This gave wide latitude for abuse and irregularity; and, as pointed out in the opinion of the court in this case, the few opinions which held such absentee voting invalid were based upon such reasons."

And in the opinion of Bullington v. Grabow, supra, the Colorado court used this language:

"In many other states which have adopted absent voters laws similar to ours, the same arguments here presented have been

elaborately considered and refuted, and such acts *uniformly* have been held constitutional." (Emphasis ours.) Citing many cases.

To quote further from the Colorado case:

"The arguments of counsel fail to overthrow the presumption of constitutionality. The purpose of the act is laudable—it permits and encourages the exercise of the elective franchise by registered voters absent from their county or too ill to attend the polls, and the Legislature has provided conditions to be performed by the voters sufficient to comply with section 11, article 7, of our Constitution. In view of the *unanimity* of *decisions* in other jurisdictions, we have no hesitancy in declaring this act constitutional." (Emphasis ours.)

The question concerning absentee voting had been raised only in the few early cases now to be noticed prior to the adoption of our Constitution as it related even indirectly to the wording "in the precinct in which he offers to vote." See Bourland v. Hildreth, 1864, 26 Cal. 161; People v. Blodgett, 1865, 13 Mich. 127; Chase v. Miller, 1862, 41 Pa. 403. These three Civil War period cases, the prevailing opinion holds, support the majority's position. With this we do not agree; but, in any event, the following two cases (also of the early period) clearly support our contention. See Morrison v. Springer, 15 Iowa 304, and State ex rel. Chandler v. Main, 16 Wis. 398, 422. And in Lehman v. McBride, 15 Ohio St. 573, likewise a case of this same early period,

we find significant language employed in connection with an appraisal of a like feature of the constitution of Ohio, although of somewhat different language. It was there said:

"* * * And it is clear that the *qualifications* which confer the *right* to vote, and the *place* at which that right may be *exercised*, are things quite distinct from each other. * * * To qualify a person for voting for township officers, residence in the township is clearly necessary. But it does not follow, as a logical consequence, that the right to vote can be exercised only within the township. If the enjoyment of the right is thus limited by the constitution, the restriction is not to be found in this section." (Emphasis ours.)

The question had been raised under quite different circumstances in all of the first above mentioned three cases, all of which held absentee voters' laws unconstitutional. So, with these five early cases, somewhat divided upon the question at the time of the convention in 1910, let's assume the delegates, being familiar with the practice of absentee voting, recognizing these differences of opinion, and being desirous of leaving open no such question as has thereafter, unfortunately, arisen to trouble us, proceeded to settle the question; and then and there it was written into the concluding paragraph of this Sec. 1 of Art. 7 the language, "the legislature shall have the power to require registration of qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting."

The fact that this question did, in after years, arise to trouble us (Thompson v. Scheier, and Baca v. Ortiz) notwithstanding this obvious precaution, must be chargeable to our failure to fully explore the field of decisions since the date of these early ones, and to carefully enough examine and consider the language of our Constitution in question in the light of what was in the minds of the constitution makers, and the Congress which subsequently examined our Constitution when it was provided as a condition precedent to our admission that we might even more securely fix as substantially unalterable the right of franchise, equal educational opportunity and unrestricted religious tolerance, when at the same time we were to make the Constitution, generally, easier of amendment. This we did at the first state election by accepting the amendments proposed by Congress.

Such a provision showing the reservation by the people of the power to regulate the *manner* of voting, is not to be found in any of the Constitutions under consideration in any case called to our attention. All of these decisions upon which we rely were made without reference to, or without the help of, a specific constitutional provision such as we have as definitely indicating that the legislature was to fix the time, place and manner of voting. This ought to make it more certain that Section 1 of Article 7 applies only to the qualifications of voters, and not to the "manner" of voting, which had been the question upon

which all of the earlier cases above cited turned.

By referring to various constitutional provisions of our sister states, we find that the phrase "offer to vote", or similar wording, is employed in at least thirty-one other state constitutions. However, only in the Constitution of the United States, so far as our research discloses, is there to be found the additional phrase which our Constitution employs, which leaves with the legislature the power to regulate the *manner* of holding elections, except in one instance. We refer to the Constitutions of Alabama, Arkansas, California, Colorado, Connecticut, Delaware, Idaho, Iowa, Kansas, Louisiana, Maryland, Mississippi, Missouri, Montana, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Virginia, Washington, West Virginia, Wisconsin, Georgia, Michigan, Texas and New Mexico.

In all legislation that has been called to our attention, or which a diligent search on our part has disclosed, not one state legislature has ever thought it necessary, in providing for absentee voting, to propose a change in their respective state constitutions regarding the phrase "offers to vote", or to propose any qualifying language in order to escape the challenge that legislation providing for absentee voting would offend unless such constitutional language were changed or qualified.

It may be safely assumed, then, that when our constitutional convention decided

to incorporate into Section 1 of Article 7 wording similar to that appearing in the statutes of the six states where it had been in issue in the courts, since desiring to leave open no question upon the subject, there was inserted the significant clause leaving to the legislature the sole power to regulate the "manner, time and places of voting." Election machine voting, we know, is quite generally held to be constitutional even when it is provided that voting shall be by "ballot", as does our constitution.

"The only substantial question raised about the constitutionality of the Act as a whole is as to whether it is in violation of Section 4 of Article 4 of the Constitution providing that all elections save those made by the General Assembly 'shall be by ballot.'

"This seems no longer an open question in the courts of the United States. The courts of all the States in which the machines have been adopted have approved their use, with the exception of the Massachusetts court, and the constitutions of all these States have a requirement like ours that popular elections shall be by ballot." Mooney v. Phillips, 173 Tenn. 398, 118 S.W. 2d 224, 226.

We know that the legislature would have the power to regulate the manner and method of voting without such reservation of power being stated in the constitution if that instrument itself does not regulate it. Therefore some significance must attach to the use of this specific reservation in the

Constitution. It was doubtless thought best to remove all doubt that the legislature would be free to provide for absentee voting, a different form of ballot to that used for over a half century prior to 1910 (which has been done, in fact) and any other matter pertaining to manner and method of voting, when this reservation of the power in the legislature was thus expressly set out.

Let us notice these three so-called contra holdings of the Civil War period upon which the majority rely so heavily to determine whether, as a matter of fact, they may be said to be authority for the precise question which is troubling us.

As to Bourland v. Hildreth, supra, it will be noted that the court did not there have before it a case wherein an absentee offer to vote was made *in* the precinct, or election district, of the elector's residence. The offer to vote there considered by the California court was an offer to vote *outside* the election district and not even by a ballot to be later sent to the precinct to be there counted. True, this decision is authority for what we were called upon to decide in the New Mexico case of Thompson v. Scheier, supra, but it.is not authority for what we unnecessarily held, as to the requirement that the voter must also present himself personally in the precinct of his residence, the point at issue here.

In People v. Blodgett, supra, so much relied upon by the majority opinion, it was also held that the Michigan statute was unconstitutional. But, the opinion, authored

by Judge Cooley, at page 169 of 13 Mich., states significantly:

"I have no hesitation in holding that when the *time, place* and *manner* of holding elections are *not* prescribed by the Constitution, they are within the discretion of the Legislature, and the reception of votes from persons actually out of the election district, or even of the States may be allowed by statute. Applying this principle to the constitutions of Ohio and Wisconsin, we cannot well doubt the validity of their statutes, and I regard the decisions made to that effect as entirely correct and satisfactory. The New England opinions, on the other hand, which held similar laws invalid, are based upon constitutional provisions, clearly fixing the locality, and their correctness is equally beyond dispute. No one of these adjudications has any bearing upon the question before us." (Emphasis ours.)

It must not pass unnoticed, then, that the Michigan constitution did not contain a clause specifying that the legislature could regulate the *manner,* time and place of holding elections, otherwise Judge Cooley would, obviously, have taken a different view. We know it to be generally held that a state may provide for absentee voting for presidential electors under the power given to the legislatures of the various states under the Federal Constitution. Sec. 1, Art. 2. The same result is to be achieved under Section 4 of Article 1 as to representatives and senators, excepting that the qualifications for electors voting for members of Congress "shall have the Qualifications requisite for Electors for the most numerous Branch of the State Legislature." Sec. 2, Art. 1. This would indicate rather clearly that under the majority opinion neither the Congress nor our state legislature, under any character of legislation, could now provide for New Mexico's absentees participation in the election of such congressional officers.

It may be said that Judge Cooley, speaking in the Michigan case of People v. Blodgett, supra, does not anywhere pass expressly upon the question of what would be the result were the voter offering a vote to become effective in the election district or ward; and he goes to some pains to distinguish the Iowa case, for which his opinion expresses great respect and from which he says he would hesitate long before coming to a conclusion opposed thereto were he persuaded that the Iowa case was in point.

It was noted in this Michigan case that "there has been no practical construction which can throw any light upon the question before us. * * * We have never before had occasion to provide for voting in any unusual way on State affairs." It can thus be seen how the majority is thrown back for support upon this and the one or two other very early cases of the same period decided more than 80 years ago, where the subject was wholly novel and the Civil War had, in a great measure, upset normal conduct in all matters of life if it had not somewhat influenced the soundness of judicial opinion. With such a vital

issue to be resolved, we cannot justify any conviction of correctness flowing alone from precedent afforded by these earlier, and easily to be distinguished, cases.

The majority thus labor arduously over what some three courts had said in these early cases of the Civil War period when absentee voting was new and untried; at a time when even the courts of that day could not entirely escape the dreadful impact from the turmoil into which the country was thrown by this fratricidal struggle. We, the minority, prefer, rather, to accept and follow the unanimous interpretation of the courts which have passed upon the question *since* 1865, and the legislative interpretation of the forty-six states of the Union where the constitutional language involved has either never troubled litigants or the courts—or, in cases where the question has been raised, it has been determined in every instance adversely to the contention of the majority opinion.

Chase v. Miller, 1862, 41 Pa. 403, is likewise not sound authority for the majority's holding since the constitution there being considered did not provide any reservation in the Constitution for the legislature to fix the *manner* of voting. It is a leading case, but leading only because of its unsoundness if we are to accept the criticisms quite universally, and, we believe appropriately, applied to it.

In the Connecticut case of Opinion of the Judges, etc., 30 Conn. 591, decided also at the time of the Civil War, holding that personal presence in the precinct was re-

quired, the decision was based upon different and unusual circumstances. It was there said:

"Our simple inquiry therefore is, whether the constitution has so fully and clearly prescribed the time, place and manner of holding elections, or either of them, as to leave, by implication, no power in the General Assembly to prescribe them, or either of them, in the way and to the extent they have attempted to do in the act in question.

"In relation to the time, place and manner of holding elections, the constitutions of the several states differ. In some of them all three are prescribed with that particularity which forbids all action by the legislature. In others neither are prescribed, but the qualification required of the voters is fixed, and the *power* to *regulate* the *time, place* and *manner committed* to the *legislature;* and in such states, the reception of votes out of the state may be constitutionally authorized." (Emphasis ours.)

In the case of Klutts v. Jones, 20 N.M. 230, 148 P. 494, 498, by this same Sec. 1, Art. 7 of our Constitution where there was employed in the language "women possessing the qualifications prescribed in this section for male electors shall be qualified electors at all such school elections," we saw no reason to restrict the elective franchise so as to deny the right of women to participate in school bond elections as distinguished from voting merely for elective officers of school districts. We held that the constitutional language should not be *re-*

*stricted.* There Mr. Chief Justice Roberts, the author of that opinion, said:

" * * * The first clause quoted from our Constitution gives women the right to vote at all 'school elections,' who possess the prescribed qualifications. They are by the Constitution made qualified electors at all 'school elections,' and, for all school election purposes, they are qualified electors. * * * Again, had the constitutional convention intended that women should only have the right to vote for officers of a school district, *it would have been easy to have said so,* but the broader term 'all such school elections' was employed." (Emphasis ours.)

No case has been called to our attention by able counsel, and our own search upon the question has disclosed no decisions at the time our Constitution was framed (and, with the exception of the cases of Thompson v. Scheier, supra, and Baca v. Ortiz, 40 N.M. 435, 61 P.2d 320, none since that time) where a court has held, or even suggested, that a state legislature could not provide absentee voting under a specific provision giving it the power to regulate the *manner* of holding elections. Certainly this doctrine of legislative reserved power as to such subject was very well established in 1910. It would appear to be equally well established today. Might it not be said, then, that it was thought by our convention that the legislature should have the same power to provide for, to regulate, the manner of voting as to all elective offices, for example, as is given it as to senators,

representatives and presidential electors by the Federal Constitution? See 5 Uni. of George Washington Law Review, page 124, for a helpful discussion of the general principle here involved.

What we have here said will be emphasized by the citations found in the above law review showing that New Mexico's holding is unsupported by any decision since the Civil War period; and this, even, without considering the helpful additional aid afforded by the specific clause in our Constitution reserving to the legislature the power to regulate the *manner,* time and places of voting, and without considering the fact that at least one of the Civil War cases the majority relies upon involved statutes wherein election districts could be formed in military camps *outside* the state. This clause, specifically leaving to the states the right to regulate the manner of voting, was not originally included, as herein stated, in any other state constitution, so far as we have been able to find it; it does not appear in any of the Constitutions which were considered in the cases cited in this law review, or in Thompson v. Scheier, supra, by our own court.

A Kentucky case (Kentucky being the one other state not now permitting absentee voting), decided in 1921, Clark v. Nash, 192 Ky. 594, 234 S.W. 1, 19 A.L.R. 304, was decided under Section 147 of the constitution of Kentucky, which requires ballots to be furnished in *private and deposited at the polls,* a provision amply sustaining the opinion of the court, a circumstance entirely at

variance with that which New Mexico presents. Also, the New Hampshire cases relied upon were decided under what is referred to as a "town meeting" constitutional provision peculiar to the New England States, and which very elaborately sets forth the manner of holding elections in such a way as to make it impossible to vote without being personally present. For a discussion of these holdings see Jenkins v. State Board, etc., supra.

A careful examination of all cases which we have been able to find shows that the only decisions since the Civil War days holding, under a like constitutional provision, that the wording "in the precinct where he offers to vote" precludes absentee voting have been the two of New Mexico, if it can be said, in fact, that a decision of the question was necessary in the Scheier case.

It may safely be said that as to the two or three decisions since the Civil War which have held absentee voting unconstitutional, they have so held under constitutional provisions wholly different from our own. Annotations upon the general question of absentee voting will be found in 19 A.L.R. 308; 35 A.L.R. 819; 121 A.L.R. 939; 132 A.L.R. 374; 140 A.L.R. 1100; and 147 A.L.R. 1443.

If there could be any doubt concerning the constitution makers' interpretation of Sec. 1 of Art. 7, we need only refer to the circumstances present in 1910 which influenced the convention in making such section almost impossible of amendment.

Both major political parties, the constitution makers, the people themselves and the Congress with whom approval or disapproval finally rested, were of one mind upon the question of securing for all time as nearly as could be done, to all the people of the proposed new state regardless of language, educational qualifications, religion or race, the right to vote, hold office and enjoy equal educational opportunities. It was proposed by Sec. 1 of Art. 7 that all male citizens (woman suffrage was later to be provided for) meeting the residential and other qualifications there set out should be qualified electors. It was provided by Sec. 3 of this article that the right to hold public office should likewise be equally enjoyed; and, by Sec. 10 of Art. 12, equal educational opportunities were to be afforded all. These particular constitutional provisions, were, under the instrument as framed, adopted and submitted to Congress, never to be modified unless by amendment first proposed by a three-fourths vote of the members elected to each House and thereafter adopted by a "majority of the electors voting thereon and by an affirmative vote equal to at least forty percentum of all the votes cast at said election in the state and in at least one-half of the counties thereof."

A long and bitter fight developed in the Congress in the Spring and Summer of 1911 over whether to admit either New Mexico or Arizona without first requiring of the people of the two territories a vote upon certain amendments proposed by Congress itself. The objection urged by some

to the Constitution of Arizona had to do with the provision relating to the recall of judges. This objection arose in the Senate and was likewise the basis of President Taft's openly avowed, and thereafter executed, threat to veto any resolution admitting Arizona until this, to him, objectionable feature should be removed by the people of Arizona by a proposed amendment to be thereafter voted upon.

The objection to the New Mexico constitution, as the Congressional Record of the time clearly shows, came largely from the House of Representatives which was insisting that as a condition precedent to congressional approval we should have to first vote upon an amendment by which it was proposed to make our constitution generally (and excepting as to Secs. 1 and 3 of Art. 7 on elective franchise and Secs. 8 and 10 of Art. 12 on education) more easily amended. The Congress, by joint resolution did require such vote of both territories; and, at the first state election held on November 7, 1911, the people of the territory of New Mexico did adopt the amendment so submitted by Congress providing that only a majority vote of the legislature would be required to submit, and, likewise, a majority vote of the electors voting upon any amendment (excepting as to the provisions above noted) would be sufficient to adopt. Whether the Constitution submitted by us was too difficult to amend, generally, became a live question in Congress, as it had been in the territory at the time of the convention and at the election following; and the inability of

the two Houses to get together upon that issue delayed for some months our admission.

The significance to be attached to what is here said with reference to Congress' concern over the amendment feature of our Constitution is, primarily, that which relates to the determination of our people, and Congress, that we should have a more easily amended Constitution, as to all general amendments, but not to include those relating to the elective franchise, equal educational opportunities and equal right to hold office, as above noted. So, with this end in view the general amendment clause was thus liberalized; and, with all parties in the territory favoring it and both branches of Congress now agreeing to respect our desires, Congress did in fact by the amendment proposed and thereafter by us adopted add even additional restrictions upon our right to amend any of the four sections above mentioned. The liberalization was brought about by making the Constitution, generally, amendable by the provision that only a majority vote of the legislature being required to submit and a majority vote of those voting on the question being sufficient to adopt.

But as to the qualification to vote and hold office, etc., this feature was to be more restricted. And this was done by requiring, in addition to the provision that a three-fourths vote in each House of the legislature would be necessary to effect submission, that the proposal should also

"be ratified by a vote of the people of this state in an election at which at least three-fourths of the electors *voting in the whole state* (not those voting *thereon,* as in the case of general amendments) and at least two-thirds of those *voting in each county* in the state shall vote for such amendment." These changes, proposed by the Congress and familiarly known as the "blue ballot" proposal, were adopted at the first state election. It will not be doubted that Secs. 1 and 3 of Art. 7, like 8 and 10 of Art. 12, were thus intentionally made almost unalterable.

The legislature has made two commendable, but futile, efforts since our two decisions (Thompson v. Scheier and Baca v. Ortiz) to secure such amendments, both of which failed, as was to be expected. The first proposal was voted on at a special election in 1937, when only constitutional amendments were proposed. And, while this amendment was adopted by a majority of the electors voting in the whole state, it fell short of adoption. For one thing, it received the required two-thirds in but one county of the state. A like amendment was again voted on at the general election of 1940; and, while it carried by a two to one majority of those voting *thereon,* it was, likewise, overwhelmingly defeated. It fell victim to the stringent requirement that it must receive a three-fourths vote of the electors voting in the *whole state* and two-thirds of such vote in each county. Only about one-third of those voting in the whole state voted at all upon this amendment, and it received the required two-

thirds vote in not one of the 31 counties. N. M. Blue Book 1941–42.

Reference is here made to the debates in Congress to be found in the Congressional Record, Vol. 47, part 2, at pages 1236 to 1247; Vol. 47, part 4, at pages 4120 to 4141; Vol. 47, part 5, at pages 4127 to 4242, and the report by Chairman Flood of the House Committee on territories to be found in Vol. 1, Misc.House Reports, 62 Cong., first session, rep No. 33. See particularly what is said at page 33 of this report.

It would be a severe and unfair rebuke to the great minds in Congress at the time, such as those of Senators Bailey of Texas, Smith of Michigan, Clapp, Heyburn, Reed of Missouri, Owen and Martine, to mention only some of those who participated in the Senate debates, and those of Representatives Flood of Virginia, Martin of Colorado, Hamilton of Michigan, Campbell, Mondell, Littleton, Cooper, Mann, Ferris and Carter, being among House members participating, to say that these men were deceiving themselves, or us, in what they there said or did. To say that when they were assuming that we were getting an easily amended Constitution (except as to the sections relating to the language, office holding and educational guarantees) we were actually having forced upon us, by them, a Constitution that would forever deprive of us any opportunity for employing the then quite universally understood, though not yet generally employed, system of absentee voting. Certainly it occurred to no one in

Congress, as the reported debates show, just as it must have occurred to no member of the constitutional convention, that the language "in which he offers to vote" would defeat the very purpose all had in mind when it was agreed to liberalize the general amendment feature of the instrument. In this connection see particularly the report of the speech of Senator Reed of Missouri, to be found beginning at page 4132 of Vol. 47, part 4, Cong.Rec. This was of the date of August 18th, 1911, the last day of the debates and the date upon which the Senate voted to admit us.

We thus arrive at the inescapable conclusion that we were in error in that which we indicated, if we did not hold, in Thompson v. Scheier and in that which we held (obviously relying, without full enough reexamination, upon what was said 'in the Scheier case) in Baca v. Ortiz.

The majority say, "caution should be exercised not to confuse the phrase 'qualified elector' as popularly understood, with the phrase 'qualified to vote' or 'entitled to vote.'" The only confusion which we can sense as likely to arise under this point is that which the majority itself would invite by their holding. The legislatures have never been confused and have never sought to distinguish the term, as the majority would here. Likewise the courts have never been so confused. Berry v. Hull, 6 N.M. 643, at page 661, 30 P. 936. Even from the earliest territorial days the terms "qualified to vote" and "qualified electors" have been used interchangeably.

For example, we find in c. 26, Rev.St.1867–68, Sec. 1703, Comp.L.1897, the duty is enjoined upon boards of registration to "make a record of the names of all the persons legally *qualified to vote.*" And see also Sec. 12, Chap. 135, Laws 1889; 1941 Comp.Laws, sec. 56-101, and even this section 1 of Art. 7 of the Constitution itself (the first paragraph) where the words are used interchangeably.

The term "in which he offers to vote," as used in the Constitution, implies no more than to say, "where he proposes to vote," "where he resides at the time of voting," or, "in his home precinct." The phrase has no relation to either qualification or manner of voting; it simply designates the period of residence required of the voter in his home precinct. It is to say, simply, that he cannot vote in any *other* precinct in the county (which was once permissible under our territorial statutes as well as under many other territorial, and state, laws) than the particular one wherein he has resided for 30 days prior to the time he asks to be permitted to, offers, or proposes, to vote.

In this connection it is to be noted that by c. 135 of the Laws of 1889 (Sec. 12) it is stated that the boards of registration "shall proceed to register the qualified voters * * *." Then by Sec. 102, c. 41, L. 1927, there is again shown the interchangeable use applicable to the phrase. This section expressly provides: "The words 'qualified elector,' 'elector' or 'voter,' mean any citizen of the United States who at the

time of the election will be over the age of twenty-one years and will have resided in the state twelve months, in the county ninety days and in the precinct in which he offers to vote thirty days * * *." This same language was employed thereafter in c. 147, Laws 1935, c. 153, Laws 1939, 1941 Comp. sec. 56-101. It is clear enough that the terms have always been and now are employed interchangeably. Such a result as proposed by the majority would, it appears to us, likewise challenge as unconstitutional any right of the legislature to enact registration laws for "qualified" voters, or electors.

Such a statute could not provide for permanent registration, such as we have, because, under such a holding, we could not have any electors, or voters, who would be qualified except at the time of meeting the additional requirement of personal presence at the polls, nor could our purging statute operate. Such a situation is so obviously inconsistent with the entire theory of registration that it could not be contemplated to have been required by our constitutional convention. A holding that a part of the qualifications of an elector is to be personally present at the polls would lead to such definite absurdities and conflicts with this registration provision of our Constitution as to be wholly irreconcilable with any rational intent.

Neither can the majority justify its position, it seems to us, by now saying that if this language does not in fact go to the qualification, it is at least a pre-requisite to his right to vote, and then reasoning that the Constitution itself had already exercised the power to regulate *a part of* the *manner* of voting when it made, as they contend, personal presence a requisite to the qualification, the right, to vote; that is to say when the Constitution provided that the legislature itself should have such power it meant only *some* of the power. No one doubts the Constitution could have reserved to itself by clearly exercising any and *all* such power over regulation of manner of voting. The point we make is that to say it did this by this particular language, "in which he offers to vote," is to appraise the intention of the framers unlike a single American state has, either legislatively or by court decision, so construed it since 1865; and it becomes a construction which is to be arrived at only when we by-pass every conventional and rational method of statutory appraisal.

It has never, heretofore, troubled this court as it has not troubled most others when it comes to a question of giving liberal interpretation to constitutional and statutory provisions relating to elections when the purpose to be served was to afford the general right of franchise on the part of all citizens entitled to vote.

This court had before it a very nice question in the case of State ex rel. Walker v. Bridges, infra [27 N.M. 169, 199 P. 373], and a strict application of the statute in question requiring registration as a condition precedent to the exercise of the elective franchise would have denied the

privilege to many voters. But Mr. Justice Parker, the author of that opinion, there boldly cuts the red tap of technical restriction upon the right to vote and declares, in justification of the position taken (concededly against much, if not the great weight of, authority): "We believe that the interests of the people will be better served by the interpretation of the election laws which we have announced."

The majority express regret at the "conditions" which impel a decision that will deny this right to vote to so many thousands of our patriotic service men and women. "But," reads the opinion, "those conditions, however, are beyond our control as a court." We are unable to view very understandingly this concluding appeal to our absentees for a sympathetic understanding of the position they take. The conditions are beyond our control as a court, it would seem to us, only because every single sign-post of statutory and constitutional construction has been ignored in arriving at the result they achieve. They propose to abandon the conventional method of appraising legislation questioned as being violative of the Constitution, and to adopt instead a most novel one. The majority, it seems to us, does not look to see whether, under any reasonable construction of the constitutional language we can uphold the power of the legislature, but, rather, the view is taken that if it *might* be said that the Constitution would prohibit, the legislation must fail. That is not our conception of the rule to be employed.

In State v. Armijo, 38 N.M. 73, 28 P. 2d 511, 514, we said:

"It is to be presumed that the Legislature, in enacting the statute, has performed its duty of keeping within constitutional bounds. State v. Hall, 23 N.M. 422, 168 P. 715; State v. Sargent, 24 N.M. 333, 171 P. 790; Abeytia v. Gibbons Garage of Magdalena, 26 N.M. 622, 195 P. 515; Asplund v. Alarid, 29 N.M. 129, 219 P. 786. In doubtful cases the statute is held constitutional, and it is only when it is *clearly violative* of the Constitution that it is so held by the courts. State v. Safford, 28 N. M. 531, 214 P. 759." (Emphasis ours.)

In State v. Ornelas, 42 N.M. 17, 74 P.2d 723, 724, in an opinion authored by Mr. Justice Bickley, now joining with the majority in the opinion in the case at bar, we stated:

"We may not refuse effect to a statute unless it is *clearly* and *beyond* a *reasonable doubt* unconstitutional." (Emphasis ours.)

Likewise we have said many times that we are not concerned with the wisdom of the law, nor with its policy or expediency. Amarillo-Pecos Valley Truck Lines v. Gallegos, 44 N.M. 120, 99 P.2d 447. And we are not to be interested in the "motive" of the legislature in enacting legislation. Christmas v. Cowden, 44 N.M. 517, 105 P.2d 484.

The rule to be employed in determining whether such statutes violate the constitution is not that the court must be satisfied that the law *is* constitutional, but only that

it cannot be said it is clearly *not* constitutional. It was said in the Iowa case of Morrison v. Springer, supra:

"In view of this well-settled rule, recognized in the foregoing cases, we feel entirely satisfied as to our duty in the present case. There is certainly a *substantial doubt.* It is certainly true that we cannot, with conclusive satisfaction, place our finger upon the language of the Constitution which is clearly and palpably violated ([Sears v. Cottrell], 5 Mich., 251), and though we might not be satisfied of its constitutionality, yet if not satisfied of its unconstitutionality, it is, our duty to uphold the law." (Emphasis ours.)

When it was suggested that, perhaps, other states which permitted absentee voting under like language of their constitutions might not have been by their own laws so committed exclusively to personal presence voting prior to the adoption of their Constitution, we examined a great many of the territorial codes of such states only to find it to be the law of not a single one that anything was then permitted except voting in person at the polls. This right to vote in absentia was given by the several legislatures only after these territories had attained statehood and under constitutions employing language identical with our own. To cite examples of only a few of such laws of other territories in force at the time of the adoption of such other state constitutions: Sec. 12, Chap. 27 Revised Code of Ter. Dakota (1877); Sec. 20, Chap. LXVI, Laws of 1855, Ter. of Kansas; Sec. 22, Chap. XXVIII, at page 287, Laws of Ter. of Colo. (1868); Sec. 3079, Chap. CCXLII, Code 1881, Ter. of Wash.; Sec. 509 (a) Revised Statutes of Ter. of Idaho (1887); Sec. 4, Chap. 17, Laws of 1905, Ter. of Okla.

It will therefore be seen that "historical background" as a reliance for the majority holding hangs upon a rather slender thread. It presents to the majority a problem which has never troubled a single other state later enjoying the right of absentee voting under a like Constitution and with like territorial voting experience.

The majority opinion likewise overlooks the important fact that the constitution makers by Sec. 5 of this same Art. 7 employ only a part of the identical language found in the old territorial statute referred to by the majority, L.1851, P. 196, Code 1915, Sec. 1999. The convention apparently lifted out of this old statute the language "all votes (elections) shall be by ballot," and, significantly, failed to employ the remaining language of the sentence, "each voter being required to deliver his own vote in person." Sec. 5 of the Constitution reads: "All elections shall be by ballot, and the person who receives the highest number of votes for any office shall be declared elected thereto." The territorial statute above cited, to which majority looks for historical background and from which the first phrase of the sentence was doubtless taken, in its completeness reads: "All votes shall be by ballot,

each voter being required to deliver his own vote in person."

Had it been the intention of the framers of the Constitution to tie us exclusively, and irretrievably, to the old method of voting in person, why did they not employ all the language of this old 1851 law instead of only a portion of it? Obviously it was not their intention to so restrict and bind the legislature, no more than we were to be tied to any previous manner or method of registration, or form of ballot to be used. We had never employed in the territorial days the so-called Australian ballot, for example. Voting had always been permitted either viva voce or by separate written or printed ballot furnished by each political party and voted as a party ticket. To quote from the North Carolina case of Jenkins v. State Board of Elections, supra:

"* * * If the personal presence of the voter had been required by section 2, those who framed the article could easily have used the words 'in which he presents himself to vote.' Such language would have put the meaning beyond doubt. At the time that section of the Constitution was adopted in 1900, absentee voting laws had been passed in many states, and in a few cases they had been before the courts for construction. The convention doubtless had knowledge of them, and did not deem it advisable to preclude the General Assembly in its discretion from enacting such statute whenever it was deemed wise to do so."

Notwithstanding the majority opinion does not expressly rest upon stare decisis, but rather upon that which they denominate soundness of rule, we have no doubt but that for the two erroneous decisions of Thompson v. Scheier and Baca v. Ortiz, supra, we would have had a unanimous court on this question, simple enough in principle. To adhere to these two earlier holdings, greater future rights than those of property are now being denied. And these are rights of those who are absent in the military service and in no position now to persevere in their own behalf. They are absent, but it is not of their own choosing. They are sacrificing, fighting and even dying that we at home might have preserved to us the right to vote in *any manner* at all! They must doubtless ponder with somewhat confused minds how we could so lightly "interpret away" their rights in this respect when it would be so simple—conceding the question to be susceptible of two constructions, as the majority do—to permit their participation in the selection of their public servants.

Our attention is called to no decision of this court where we have hesitated to overrule erroneous decisions, where property rights were not involved. We should not now permit any rule to perpetuate this far reaching error.

"When a court comes to the deliberate conclusion that it has made a mistake * * * it is generally better, * * * that it shall frankly acknowledge its mistake and declare the true doctrine as it

should have been." Hines v. Driver, 89 Ind. 339, 342.

"There are occasions when departure from it (stare decisis) is rendered necessary in order to vindicate plain and obvious principles of law, and to remedy a continuing injustice." The Madrid, C.C., 40 F. 677, 679, cited in McGregor v. Provident Trust Co., 119 Fla. 718, 162 So. 323

"Infallibility is to be conceded to no human tribunal. A legal principle, to be well settled, must be founded on *sound reason.* * * * Precedents are to be regarded as the great store-house of experience; *not always to be followed, but to be looked to as beacon lights in the progress of judicial investigation* * * *." Leavitt v. Morrow, 6 Ohio St. 71, 72, 67 Am. Dec. 334.

Someone has said that "pride of opinion has closed the door upon many an honest inquiry". However, pride of judicial opinion is never permitted to restrain an honest effort to ascertain presently the truth theretofore misconceived. That is why courts have always been and now remain the bulwark of our liberties, the exponent of intellectual integrity and the final repository of justice. It is the place where litigants, too often imbued with selfishness, stubborness, ignorance and pride of opinion come to get the answer— an answer for which courts will search unincumbered by these too common human frailties. When an injustice results from our misappraisal of the law, as occasionally it must, it is to be all the more regretted as it is all the more keenly felt.

Aggressive tyrants of other countries have frequently usurped political power under promise and pretension to more appropriately and certainly apply exact justice to particular cases. They often cite the written law as being too inflexible to serve the average man or particular purposes. Yet we know that English and American courts have consistently restated and relied upon the principle that the law is not frigid and unyielding, but that it is, rather, a live, growing institution, always keeping pace with the advance of civilization and the needs of the time. It strikes us as most unfortunate that this court will now so unnecessarily restrict this matter of expansion and growth; that it will, in fact, destroy the very root— the constitutional root—which affords legislative growth and expansion. We would deny to the legislature, the people, the right ever, in all probability, and certainly until the entire constitution may be overhauled through a convention, to permit the operation of a system of voting which has, quite universally, been thought desirable and which is now practiced in all but one other American state! And we do it by judicial fiat through what is, certainly, an unnecessary, if not an illogical, interpretation of the Constitution.

We cannot visualize a more serious blow to the free exercise of that supreme and cherished right, the right of equal opportunity of all qualified citizens to vote, than flows from this majority decision. The extent to which the baneful rule will operate is more deeply impressed upon us

when we stop to consider that it will perhaps, at this particular time, result in the denial of the right of franchise to one-fourth to one-third of our potential voting population.

The majority opinion would thus credit the constitution makers, Congress, and the people of the territory who adopted the instrument with no vision at all when, in fact, every page of the document, by its brevity and the significant language employed—and omitted—bespeaks for the work its character as basic law, only.

"The supreme right guaranteed by the Constitution of the state is the right of a citizen to vote at public elections" (State ex rel. Walker v. Bridges, 27 N.M. 169, 199 P. 370, 372); and yet this simple six word phrase is now to be construed to deny this "supreme right" under circumstances in which not one other American court, for eighty years, has so construed it!

It seems to the minority that but one course lies open to us. That is to distinguish and explain Thompson v. Scheier, overrule Ortiz v. Baca, and properly declare the law. For the reasons stated we dissent.

THREET, J., concurs in the dissent.

On Motion for Rehearing.

PER CURIAM.

We have just heard able and illuminating oral argument by counsel for plaintiff and amici curiae aligning themselves with him as well as by counsel for the defendants. After careful consideration, all of us, the majority as well as the minority, remain of the same opinions as. reflected by the majority and minority opinions heretofore filed in this proceeding. Even if the majority were otherwise convinced, an important matter first noticed by a member of the court on the eve of oral argument on this motion, and called to the attention of counsel from the bench at the oral argument. would compel a dismissal of the complaint. Laws 1943, c. 113, § II, subparagraph 12, an act of the legislature applying to all general, special and primary elections, doubtless adopted conformably to our previous decisions, reads as follows:

"No ballot may be received or counted, which is not cast at the polling place by the qualified voter in person."

The motion for rehearing will be denied.

It is so ordered.

SADLER, C. J., and MABRY, BICKLEY, BRICE. and THREET, JJ., concur.